# EXHIBIT A

**IN THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY, PENNSYLVANIA**

Case# 2016-04721-4 Docketed at Montgomery County Prothonotary on 05/31/2016 3:43 PM, Fee = $0.00

BRUCE G OBRIEN DBA DAEDALUS BIOTECH
ADVISORS

vs.

SHIRE

NO. 2016-04721

## NOTICE TO DEFEND - CIVIL

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW. THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.

IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.

LAWYER REFERENCE SERVICE
MONTGOMERY  BAR ASSOCATION
100 West Airy Street (REAR)
NORRISTOWN, PA 19404-0268

(610) 279-9660, EXTENSION 201

PRIF0034
R 10/11

Case# 2016-04721-4 Docketed at Montgomery County Prothonotary on 05/31/2016 3:43 PM, Fee = $0.00

| | |
|---|---|
| **CLARK HILL PLC**<br>JONATHAN W. HUGG, ESQ.<br>(Pa. Id. No. 73589)<br>jhugg@clarkhill.com<br>SAMUEL A. HORNAK, ESQ.<br>(Pa. Id. No. 312360)<br>shornak@clarkhill.com<br>JONATHAN D. KLEIN, ESQ.<br>(Pa. Id. No. 309967)<br>jklein@clarkhill.com<br>One Commerce Square<br>2005 Market Street, Suite 1000<br>Philadelphia, PA 19103<br>(215) 640-8500 (Telephone)<br>(215) 640-8501 (Facsimile) | *Attorneys for Plaintiff,*<br>*Bruce G. O'Brien d/b/a*<br>*Daedalus Biotech Advisors* |
| BRUCE G. O'BRIEN d/b/a<br>DAEDALUS BIOTECH ADVISORS,<br><br>        Plaintiff,<br><br>        v.<br><br>SHIRE, SHIRE PLC,<br>SHIRE PHARMACEUTICAL HOLDINGS<br>IRELAND LIMITED,<br>SHIRE PHARMACEUTICALS<br>INTERNATIONAL, and<br>SHIRE VIROPHARMA INCORPORATED,<br><br>        Defendants | COURT OF COMMON PLEAS OF<br>MONTGOMERY COUNTY,<br>PENNSYLVANIA<br><br>NO. 2016-4721<br><br>**JURY TRIAL DEMANDED** |

## NOTICE TO DEFEND

### NOTICE

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

204617523

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE.  IF YOU DO NOT
HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE
SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

LAWYER REFERENCE SERVICE
MONTGOMERY COUNTY BAR ASSOCIATION
100 WEST AIRY STREET (REAR)
NORRISTOWN, PA 19401

## COMPLAINT

Plaintiff, Bruce G. O'Brien d/b/a Daedalus Biotech Advisors, by and through his

undersigned counsel, brings this action against defendants Shire, Shire plc, Shire Pharmaceutical

Holdings Ireland Limited, Shire Pharmaceuticals International, and Shire ViroPharma

Incorporated (unless identified individually, collectively, "Shire" or "defendants").  Mr. O'Brien

requests that this Court enter judgment in his favor and against defendants.  In support thereof,

Mr. O'Brien avers as follows:

## INTRODUCTION AND NATURE OF THE ACTION

1.   Mr. O'Brien entered into an agreement with defendant Shire ViroPharma

Incorporated (formerly known as Viropharma Incorporated), whereby Mr. O'Brien would

provide certain services to assist Shire ViroPharma in making certain acquisitions.

2.   In exchange for the services that Mr. O'Brien provided under that agreement, which

restricted Mr. O'Brien's ability to perform those services on behalf of any other party, Shire

ViroPharma Incorporated agreed to pay to Mr. O'Brien one percent of the consideration paid for

any acquisition identified and preliminarily analyzed by Mr. O'Brien, and included on Exhibit A

to the Finder's Fee Agreement, as defined below.

3.   For years Mr. O'Brien faithfully provided Shire ViroPharma Incorporated, and later

defendants, with information and introductory analysis pursuant to their contract, and refrained

2

Case# 2016-04721-4 Docketed at Montgomery County Prothonotary on 05/31/2016 3:43 PM, Fee = $0.00

Case# 2016-04721-4 Docketed at Montgomery County Prothonotary on 05/31/2016 3:43 PM, Fee = $0.00

from employing his expertise in the service of any other biopharmaceutical company that sought to make the acquisitions identified by Mr. O'Brien and subsequently listed on Exhibit A.

4.   In early 2016, following repeated suggestions made over the course of a decade by Mr. O'Brien, defendants acquired Dyax Corp., a corporation identified and analyzed by Mr. O'Brien, in a transaction covered by the agreement between Mr. O'Brien and defendants.

5.   To date, despite his requests, defendants have failed to make payment to Mr. O'Brien for the amount due under their contract.

6.   The refusal by defendants to pay Mr. O'Brien not only breaches the agreement between them, but also constitutes the unjust retention by defendants of a valuable benefit conferred upon them by Mr. O'Brien.

7.   Mr. O'Brien requests that this Court enter judgment in his favor and against defendants, jointly and severally, based upon the failure of defendants to satisfy their obligations under the valid contract between defendants and Mr. O'Brien.

## PARTIES AND VENUE

8.   Mr. O'Brien is an adult individual who does business as Daedalus Biotech Advisors ("Daedalus").

9.   Shire plc is a corporation incorporated in Jersey, with a principal place of business located at 5 Riverwalk, Citywest Business Campus, Dublin 24, Republic of Ireland D24 TW 13.

10.   On information and belief, Shire plc also has a principal place of business at 300 Shire Way, Lexington, MA 02421.

11.   Shire Pharmaceutical Holdings Ireland Limited is a corporation incorporated in the Republic of Ireland, with a principal place of business located at 5 Riverwalk, Citywest Business Campus, Dublin 24, Republic of Ireland D24 TW 13.

3

204617523

Case# 2016-04721-4 Docketed at Montgomery County Prothonotary on 05/31/2016 3:43 PM, Fee = $0.00

12.   Shire Pharmaceuticals International is a corporation incorporated in the Republic of Ireland with a principal place of business located at 5 Riverwalk, Citywest Business Campus, Dublin 24, Republic of Ireland D24 TW 13.

13.   Shire ViroPharma Incorporated ("Shire ViroPharma") is a Delaware corporation with a principal place of business located at 730 Stockton Drive, Exton, Pennsylvania 19335. Shire ViroPharma is the new name for an entity previously known as ViroPharma Incorporated ("ViroPharma").

14.   Defendants are principals and agents of each other and jointly and severally liable to Mr. O'Brien.

15.   Daedalus was party to a Finder's Fee Agreement with ViroPharma, dated June 2007 (the "Original Agreement"), as well as a subsequent Amended and Restated Finder's Fee Agreement, dated November 30, 2012 (the "Finder's Fee Agreement").  True and correct copies of the Original Agreement and the Finder's Fee Agreement are attached hereto and incorporated herein as "Exhibit 1" and "Exhibit 2," respectively.

16.   The Finder's Fee Agreement is a contract between Mr. O'Brien and defendants.

17.   The parties formed the Original Agreement and the Finder's Fee Agreement, and Mr. O'Brien performed those agreements, in Montgomery County, in the Commonwealth of Pennsylvania.

18.   The causes of action asserted in this pleading accrued in Montgomery County, in the Commonwealth of Pennsylvania.

19.   Venue is proper in this Court pursuant to Pennsylvania Rule of Civil Procedure 2179.

4

204617523

Case# 2016-04721-4 Docketed at Montgomery County Prothonotary on 05/31/2016 3:43 PM, Fee = $0.00

## FACTUAL BACKGROUND

20.    Mr. O'Brien has been devoted to analyzing biotechnology companies – such as Dyax Corp. ("Dyax"), a Delaware corporation – for their investment potential, either as stock purchases or as potential acquisition targets, for many years.

### The Relationship Between Mr. O'Brien and ViroPharma And The Resultant Finder's Fee Agreement

21.    Mr. O'Brien originally contacted ViroPharma in the late 1990s about a potential investment, which never came to fruition.

22.    Following that initial contact, Mr. O'Brien remained in touch with employees of ViroPharma and eventually met with Michel de Rosen after Mr. de Rosen became CEO of ViroPharma.

23.    During their discussions in 2005 and 2006, Mr. de Rosen told Mr. O'Brien that ViroPharma was interested in licensing certain new drugs or drug candidates, and advised Mr. O'Brien of the areas in which ViroPharma had a particular interest.

24.    In 2006, Mr. O'Brien and ViroPharma continued their discussions, with a focus on one of the areas of interest identified by Mr. de Rosen – specifically, hospital-administered pharmaceuticals – on the basis that with its antibiotic Vancocin ViroPharma already had experience in marketing this class of drugs.

25.    In 2006, Mr. O'Brien suggested that ViroPharma acquire Dyax because: (1) Dyax's lead drug candidate (DX-88) was to be hospital-administered, a major criterion of Mr. de Rosen at the time; (2) the principal target of DX-88, hereditary angioedema (HAE), was a serious, potentially fatal disease without adequate treatment approved in the United States; (3) HAE was an "orphan disease" (i.e., a disease affecting fewer than 200,000 people in the United States), which would allow for generous pricing; (4) DX-88 was also a potential therapy for a second

5

204617523

Case# 2016-04721-4 Docketed at Montgomery County Prothonotary on 05/31/2016 3:43 PM, Fee = $0.00

hospital-based use:  coronary artery bypass graft surgery (CABG);  (5) in its Phage Display

technology Dyax had an advanced platform technology with the potential to generate multiple

advanced therapies either marketed directly by Dyax or licensed to other biopharmaceutical

companies;  and (6) in what could become a lucrative stream of future revenues, Dyax had

already partnered with dozens of biopharma firms, licensing access to its Phage Display

technology in exchange for milestone-based payments and royalties from multiple drug

candidates in development by its partners.

26.    Mr. de Rosen told Mr. O'Brien that Mr. O'Brien would receive compensation for

introducing ViroPharma to a company that ViroPharma ultimately acquired.

27.    That understanding and arrangement was ultimately reduced to writing in June

2007, when Mr. O'Brien and ViroPharma entered into the Original Agreement.

28.    An authorized representative of ViroPharma executed the Original Agreement.

29.    Both before and after the execution of the Original Agreement, Mr. O'Brien also

introduced ViroPharma to other acquisition candidates.

30.    Pursuant to the Original Agreement, ViroPharma engaged Mr. O'Brien "to assist

the Company [ViroPharma] in connection with a proposed acquisition of or other substantial

transaction (a "Transaction") involving one or more pharmaceutical compounds or technologies

("Targets") or companies involved with one or more pharmaceutical compounds or technologies,

including any Target (a "Development Firm") each as identified on Exhibit A." See Exhibit 1,

p. 1.

31.    The Original Agreement required Mr. O'Brien to provide the following services to

ViroPharma:

> A) Disclose the name and purpose of the target or Development Firm to
> the Company in writing to the Company's Chief Executive Officer

6

204617523

Case# 2016-04721-4 Docketed at Montgomery County Prothonotary on 05/31/2016 3:43 PM, Fee = $0.00

with a copy to the Company's Vice President of Business Development. If Company, or any of its agents, has previously engaged in discussions with senior management of the Development Firm regarding a Transaction relating to that Target, Company will promptly, and in any event within five business days, so advise Daedalus and the parties shall not list such Target or Development Firm on Exhibit A. If the Company does not so advise Daedalus, then the Target or Development Firm shall be added to Exhibit A; one party will notify the other in writing (including by email) each time a Target or Development Firm is added to Exhibit A. No fee shall be payable by Company to Daedalus pursuant to this Agreement unless the Target and/or Development Firm are identified on Exhibit A.

B) Once a Target or Development Firm has been added to Exhibit A, deliver to the Company a written analysis of the therapeutic area, development/regulatory status, sales and marketing efforts, exclusivity proposition regarding the Target or Development Firm and an explanation why Daedalus believes Target or Development Firm would be a good candidate for a Transaction based upon the information in Daedalus' possession, provided however that Daedalus shall make reasonable efforts to consider information which is publicly available. If requested by the Company, this information would be presented in person to members of the Company's management at the Company's offices in Exton, PA.

C) When requested by the Company, contact the Development Firm by telephone and introduce the Company's CEO to senior management of the Development Firm. To the extent reasonably requested by the Company, Daedalus will attend up to three meetings of the Company's management for the purpose of evaluating the Target or Development Firm and any proposed Transaction and, if requested by the Company, will also attend meetings between the Company and the Development Firm.

See Exhibit 1, Section I ("Services to be Performed").

32.    As compensation for the provision of these services, the Original Agreement provided as follows:

If: (a) the Company has not previously engaged in discussions with senior management of the Development Firm regarding a Transaction involving the Target or the Development Firm, and (b) a Transaction is during the Fee Period as defined below, Company shall pay Daedalus a fee in cash equal to one percent of the total consideration paid by the Company pursuant to Agreements entered into during the Fee Period in connection

7

204617523

Case# 2016-04721-4 Docketed at Montgomery County Prothonotary on 05/31/2016 3:43 PM, Fee = $0.00

with the Transaction (as further defined below, the "Consideration"). For each Target or Development Firm listed on Exhibit A, the "Fee Period" is the period from the date the Target or Development Firm is listed on Exhibit A to the later of (i) two years after the Company first advises Daedalus pursuant to Section III(E) that it is no longer actively considering a Transaction involving such Target or Development Firm or (ii) if, before the end of the two year period described in clause (i), Company has engaged in a Transaction involving the Target or Development Firm, four years from the date of such Transaction. Whether or not a Transaction is consummated, the Company will also reimburse Daedalus for any travel or other expenses reasonably incurred by Daedalus in connection with his services hereunder that have been approved in advance by the Company. Daedalus will not incur any expenses without approval from the Company. Notwithstanding anything in this Agreement that may be deemed to the contrary, if a Development Firm enters into a transaction regarding a Target with a third party not listed on Exhibit A that is unrelated to Company (a "Third Party"), and Company at any time enters into a transaction with such Third Party, then such transaction between Company and the Third Party shall not be a "Transaction" for purposes of this Agreement, and the Company shall have no obligation to pay Daedalus any amount in respect of Company's Transaction with any Third-Party.

Consideration shall include the total amount paid by the Company to the Development Firm or its shareholders or others, whether such payments take the form of cash, and/or common stock, preferred stock or debt issued by the Company. In the event that the aggregate consideration for a Transaction by the Company consists in whole or in part of stock, for the purposes of calculating the amount of aggregate consideration, the value of such securities will be (in the case of the existence of a public trading market therefor) the average bid or closing prices for the twenty business days preceding the issuance of the stock in the transaction, or (in the absence of a public trading market thereof) the fair market value thereof as the Company and Daedalus agree on the day preceding the issuance of the stock in the Transaction. If the value of the stock needs to be determined, pursuant to the next paragraph, on more than one occasion in connection with the Transaction, the value of the stock will be determined in such manner with respect to the days on which stock is issued.

Subject to the terms of this Agreement, at closing, Daedalus will be paid fees based on the total calculated Consideration, even if the total amount of Consideration is not paid at closing. For example, if Company agrees to pay a portion of the Consideration (for example, in the form of a note) over an agreed upon period (such as 3-5 years), Daedalus will be paid this total calculable consideration at closing based on the stated terms of such Consideration (but not including interest payable in the future), without

204617523

Case# 2016-04721-4 Docketed at Montgomery County Prothonotary on 05/31/2016 3:43 PM, Fee = $0.00

regard to whether payments are ultimately made. The only exception will be if a portion of the Consideration is incalculable at closing (such as an earn-out, royalties, payments contingent on future sales, milestone payments, or other incentives based on future performance, etc.). In that case, that portion, and only that portion, of Daedalus' fees relating to such incalculable Consideration shall be paid to Daedalus if and when that portion of the Consideration is payable.

See Exhibit 1, Section II ("Compensation for Services").

33.    In exchange for this Consideration, the Original Agreement also provides for the

following with respect to Mr. O'Brien's duties under the Original Agreement:

Daedalus shall keep confidential and shall not disclose to any third person, all information (a) that is disclosed by the Company to Daedalus that is not in the public domain, (b) relating to this Agreement, including the fact that the Company has entered into this Agreement with Daedalus; and (c) that is later developed by Daedalus regarding Target in connections with the Company's evaluation and/or pursuit of the Transaction (collectively, "Information"). Daedalus shall use the Information only to assist the Company in evaluating and consummating the Transaction. Daedalus' obligations in clauses (a), (b), and (c) shall survive the termination of this Agreement.
…
For four weeks after the date the Target or Development Firm on Exhibit A is first disclosed to the Company, Daedalus shall not disclose to any third party any information relating to the Transaction or the Target, and shall not assist any third person in any evaluation, consideration or negotiation of a Transaction (or any other transaction) involving the Target or Development Firm. This restriction shall continue after such four-week period if prior to the end thereof, the Company has authorized Daedalus pursuant to Section 1(c) hereof to contact the Development Firm and thereafter until Company notifies Daedalus in writing that Company is not pursuing such Target or Development Firm. In the event that Company ceases the active pursuit of the Target or Development Firm, it shall promptly notify Daedalus in writing.

See Exhibit 1, Section III ("Daedalus Representations and Covenants"), ¶¶ A & E.

34.    Among the entities identified on Exhibit A to the Original Agreement was Dyax.

See Exhibit A to Exhibit 1 hereto.

204617523

### Mr. O'Brien's Identification, Analysis, and
### Extensive Communications with ViroPharma Regarding Dyax

35.    As early as 2006, Mr. O'Brien had provided ViroPharma with written reports regarding Dyax.

36.    On June 21, 2006 at a dinner meeting at George's restaurant in Wayne, Pennsylvania, Mr. O'Brien provided Michel de Rosen, the CEO of ViroPharma, with an initial report on Dyax, which contained detailed information about Dyax, including:  corporate and financial information, descriptions of Dyax's assets, highlights of Dyax's products and patents, outlines of potential corporate partnerships, statistics relating to corporate valuations, and analysis of a potential strategic opportunity for ViroPharma in hereditary angioedema (HAE), an orphan disease presenting significant unmet medical need.  A true and correct copy of the initial report provided by Mr. O'Brien to ViroPharma on June 21, 2006 (the "Initial Report") is attached hereto and incorporated herein as "Exhibit 3."

37.    Following the delivery of the Initial Report, Mr. O'Brien had numerous meetings and telephone conversations with Mr. de Rosen, as well as with ViroPharma executives Vincent Milano (Chief Financial Officer for ViroPharma) and Clayton Fletcher (Vice President of Business Development for ViroPharma) concerning Dyax.

38.    After the execution of the Original Agreement, Mr. O'Brien continued to introduce ViroPharma to more potential acquisition candidates and provided substantial and valuable information to ViroPharma through numerous meetings, phone calls, and emails over the course of many years, without compensation.

39.    ViroPharma acquired several companies similar to those identified and analyzed by Mr. O'Brien.

Case# 2016-04721-4 Docketed at Montgomery County Prothonotary on 05/31/2016 3:43 PM, Fee = $0.00

204617523

Case# 2016-04721-4 Docketed at Montgomery County Prothonotary on 05/31/2016 3:43 PM, Fee = $0.00

40.   For example, while Mr. O'Brien was recommending an acquisition of Dyax, whose leading drug candidate addressed HAE and would have established ViroPharma's market standing and expertise in the treatment of HAE, ViroPharma acquired Lev Pharmaceuticals in 2008.

41.   Lev Pharmaceuticals' most prominent product was the HAE drug Cinryze, which has become very popular and extremely successful for ViroPharma and, eventually, defendants.

42.   Prior to Mr. O'Brien's recommendation of Dyax and its HAE drug, ViroPharma was not considering drugs to treat HAE.  Upon information and belief,  Viropharma would not have acquired Lev Pharmaceuticals absent the introduction to HAE and the analysis of the commercial opportunity in treating HAE that was provided by Mr. O'Brien more than a year before the Lev acquisition.

43.   In 2007, at the direction and request of Mr. de Rosen, Mr. O'Brien contacted senior management at Dyax to discuss the possibility of ViroPharma acquiring either a Dyax process known as DX-88 or the entirety of Dyax.

44.   In December 2007, Mr. O'Brien spoke with Mr. de Rosen and advised him of Mr. O'Brien's analysis that Dyax was an extraordinary opportunity at its then market capitalization of $180 million, which included $60 million in cash.

45.   On February 27, 2009, Mr. O'Brien had lunch with Mr. de Rosen's successor as CEO of ViroPharma, Vincent Milano.

46.   At that lunch meeting, Mr. O'Brien discussed the progress that Dyax was making and its attractiveness as an acquisition target.  ViroPharma had just entered the HAE market with its introduction of the drug Cinryze.  Mr. O'Brien suggested that Viropharma's acquisition of Dyax and its complementary drug, Kalbitor, then nearing approval for treatment of acute HAE,

11

204617523

would allow Dyax to dominate the entire U.S. market. And once again, Mr. O'Brien emphasized the value of Dyax's Phage Display technology and the related partnerships.

47.    In July 2009, Mr. O'Brien made a presentation to Mr. Fletcher and Mr. Milano discussing the virtues of acquiring Dyax. This included Mr. O'Brien's analysis that an acquisition of Dyax was particularly attractive at that time because Dyax's very low stock price did not accurately reflect its progress as a company, and Dyax could be acquired far below its true value.

48.    Over the next several years, Mr. O'Brien provided regular telephone and email updates about Dyax to Mr. Fletcher and/or Mr. Milano.

### The Finder's Fee Agreement and Mr. O'Brien's Continued Identification, Analysis, and Extensive Communications with ViroPharma Regarding Dyax

49.    By 2012, Mr. O'Brien was performing a substantial amount of work for ViroPharma, but had not yet received any compensation.

50.    By 2012 Dyax's DX-2930 HAE drug candidate was completing pre-clinical studies and was about to enter Phase 1 clinical trials.

51.    From 2012 on, Mr. O'Brien had numerous conversations and email communications with Mr. Fletcher, the Vice President of Business Development for ViroPharma, continuing the flow of information from Mr. O'Brien to ViroPharma regarding the benefits of acquiring Dyax.

52.    On November 29, 2012, Mr. O'Brien and ViroPharma, executed the Finder's Fee Agreement.

204617523

Case# 2016-04721-4 Docketed at Montgomery County Prothonotary on 05/31/2016 3:43 PM, Fee = $0.00

Case# 2016-04721-4 Docketed at Montgomery County Prothonotary on 05/31/2016 3:43 PM, Fee = $0.00

53.     The Finder's Fee Agreement was executed on behalf of ViroPharma by an authorized representative of ViroPharma, and represents a valid contract between ViroPharma and Mr. O'Brien.  See Exhibit 2.

54.     The Finder's Fee Agreement provided for substantially similar terms as those in the Original Agreement, but also provided for an advance against the finder's fee owed by Viropharma on the first Exhibit A company acquired.  This advance of $12,500 was paid, upon execution of the Finder's Fee Agreement, by ViroPharma to Mr. O'Brien.  See Exhibit 2, Section II ("Compensation for Services").

55.     Other than the addition of the $12,500 advance, the services Mr. O'Brien was to provide, the restrictions upon Mr. O'Brien, and the compensation/consideration ViroPharma would pay Mr. O'Brien by ViroPharma were the same in the Finder's Fee Agreement as in the Original Agreement.

56.     The Finder's Fee Agreement included a "corrected" and updated version of Exhibit A to the Original Agreement, which continued to identify Dyax.

57.     Exhibit A to the Finder's Fee Agreement was updated and amended periodically, and the most recent revision to Exhibit A to the Finder's Fee Agreement continued to identify Dyax.  A true and correct copy of the most recent Exhibit A to the Finder's Fee Agreement is attached hereto as "Exhibit 2A."

58.     On November 29, 2012, ViroPharma and Mr. O'Brien also entered into a Consulting Agreement, a true and correct copy of which is attached hereto and incorporated herein as "Exhibit 4."

59.     The Consulting Agreement provided that "[i]n addition to the services to be provided under the Finder's Fee Agreement, Consultant [Mr. O'Brien] shall provide the

13

204617523

following "Services" as directed by ViroPharma:  preparation of reports and research related to

Business Development Opportunities." See Exhibit 4, Section 1(a) ("Services").

60.    As compensation, the Consulting Agreement provided that "ViroPharma shall pay

Consultant $300 per hour.  ViroPharma shall not be obligated to pay Consultant more than

$50,000 for the Services without the prior consent of ViroPharma." See Exhibit 4, Section 2

("Compensation & Expenses").

61.    ViroPharma subsequently amended the Consulting Agreement on three occasions to

modify hourly and maximum compensation for Mr. O'Brien, and to extend the duration of that

contract.

62.    In 2013, Mr. O'Brien sent many emails and participated in multiple telephone calls

with Mr. Fletcher to update him on positive developments at Dyax, including, *inter alia*:  1)

promising preclinical studies suggesting that Dyax's second generation HAE drug DX-2930

offered the potential for once-monthly administration;  2) the potential use of Dyax's kallikrein

inhibitors to treat the rare diseases known as Netherton Syndrome and Diabetic Macular Edema;

3) the potential of Dyax's Phage Display technology platform to provide a regular stream of

attractive drug candidates to Dyax and its licensees;  4) a future revenue stream from more than a

dozen drug candidates in Dyax's Licensing and Funded Research Portfolio ("LFRP") in clinical

development at some of the world's leading pharmaceutical companies – including

Ramucirumab (Cyramza), a compound with blockbuster potential now marketed by Lilly to treat

gastric, lung, and colorectal cancer and in clinical development for multiple other tumor types ;

and 5) the possibility of expanding the share of Dyax's drug Kalbitor of the acute HAE market.

All of these drugs, both in sole development by Dyax and partnered, are products of Dyax's own

first-rate Phage Display technology.

204617523

Case# 2016-04721-4 Docketed at Montgomery County Prothonotary on 05/31/2016 3:43 PM, Fee = $0.00

Case# 2016-04721-4 Docketed at Montgomery County Prothonotary on 05/31/2016 3:43 PM, Fee = $0.00

63.    On July 11, 2013 Mr. O'Brien stated to Mr. Fletcher, "I feel as strongly about a Dyax acquisition today, if not more so, than ever."

64.    On September 25, 2013, Mr. O'Brien made a strategic presentation for more than two hours to Mr. Milano and Mr. Fletcher at ViroPharma's office.

65.    In addition to a discussion of Mr. O'Brien's work involving lysosomal storage disorders, more than an hour of the September 25, 2013 meeting was devoted to:  1) Mr. O'Brien's discussion of a strategy for creating a first-rate pharmaceutical product pipeline and how ViroPharma could successfully compete with larger firms for desirable assets;  2) protection of ViroPharma's HAE market position in light of Dyax's DX-2930 potential for once monthly administration, and in light of Biocryst's oral kallikrein development program;  3) an update on Dyax's Phage Display partnerships with an emphasis on Ramucirumab and other potential blockbusters producing an ever-increasing revenue stream for Dyax;  4) a discussion of the potential acquisition of either Dyax or Biocryst in detail;  and 5) other immediate acquisition opportunities in orphan indications outside HAE.

66.    The September 25, 2013 meeting was another instance where Mr. O'Brien made a presentation to ViroPharma about the opportunities available in the HAE market, which continued through Shire's acquisition of ViroPharma and later acquisition of Dyax.

67.    During this meeting, Mr. Milano and Mr. Fletcher listened closely and much of the information that Mr. O'Brien conveyed was ultimately used by ViroPharma in pursuing its acquisition by Shire.

68.    Notably, during this meeting, Mr. O'Brien actually suggested that ViroPharma model itself on Shire when it came to drug development by making a significant early stage

15

204617523

Case# 2016-04721-4 Docketed at Montgomery County Prothonotary on 05/31/2016 3:43 PM, Fee = $0.00

investment into promising programs, both commercial and academic, to maximize the productivity of the firm's business development effort.

69.    In October 2013, Mr. O'Brien spoke with Mr. Fletcher and again emphasized the multiple advantages to Viropharma of an acquisition of Dyax.

70.    Mr. O'Brien continued to provide ViroPharma with a significant amount of important and material information on the orphan drug market, including the building competitive threat in the HAE market, which helped ViroPharma in negotiating the sale of ViroPharma to Shire.

### The Shire ViroPharma Merger and Shire's Assumption of the Finder's Fee Agreement

71.    On or about November 11, 2013, defendant Shire Pharmaceutical Holdings Ireland Limited, Venus Newco, Inc., ViroPharma and defendant Shire plc, Venus Newco, Inc. (a merger subsidiary of defendant Shire Pharmaceutical Holdings Ireland Limited, which was itself a subsidiary of defendant Shire plc), entered into an Agreement and Plan of Merger pursuant to which Venus Newco, Inc. merged into ViroPharma (the "Shire ViroPharma Merger") so that ViroPharma became part of defendant Shire. A true and correct copy of the relevant portion of the Agreement and Plan of Merger ("Shire ViroPharma Merger Agreement"), which is publicly-filed, is attached hereto and incorporated herein as "Exhibit 5."

72.    Prior to the Shire-ViroPharma Merger, Mr. Milano informed defendant Shire that: (1) ViroPharma had a contractual relationship with Mr. O'Brien; and (2) if defendant Shire were to acquire ViroPharma, defendant Shire would be obligated to Mr. O'Brien in the event that defendant Shire acquired any of the companies identified on Exhibit A to the Finder's Fee Agreement. Defendant Shire told Mr. Milano that they understood and accepted that obligation.

16

204617523

Case# 2016-04721-4 Docketed at Montgomery County Prothonotary on 05/31/2016 3:43 PM, Fee = $0.00

73.    Following the Shire ViroPharma Merger, Venus Newco, Inc. ceased to exist.  See Exhibit 5, Article II, Section 2.1.

74.    Following the Shire ViroPharma Merger, ViroPharma changed its name to defendant Shire ViroPharma Incorporated.

75.    In 2013, in anticipation of the Shire ViroPharma Merger, David Colpman, Head of Worldwide Business Development of defendant Shire, acknowledged to both Mr. Milano and Mr. Fletcher that defendant Shire would recognize the Finders Fee Agreement.

76.    At the time of this acknowledgement, Messrs. Colpman, Milano and Fletcher discussed protecting defendant Shire's market position in HAE treatment, which Mr. O'Brien had helped to cultivate.

77.    When Mr. O'Brien later met, following the Shire ViroPharma Merger, with Mr. Colpman, Mr. Fletcher and Deanna Petersen, Vice President Business Development for defendant Shire, Mr. Colpman again acknowledged the existence of the Finder's Fee Agreement and admitted defendant Shire's obligations to Mr. O'Brien under the Finder's Fee Agreement.

78.    In these meetings and through the communications between Shire officials and Mr. O'Brien, defendant Shire indicated it had adopted the Finder's Fee Agreement previously executed between ViroPharma and Mr. O'Brien.

79.    On November 7, 2013, four days prior to the date of the Shire Viropharma Merger Agreement referenced below, Shire issued a press release stating that it "has been implementing the 'One Shire' reorganisation aimed at simplifying the business.  Prior to this, Shire had three autonomous divisions, each with their own R&D, supply chain, technical operations and commercial infrastructures.  These three divisions are being reorganised so they are one business, with much reduced overlap." (emphasis added)  See "Exhibit 6."

17

204617523

80.     Shire comprises a single operational and reporting segment engaged in the

research, development, licensing, manufacturing, marketing, distribution, and sale of innovative

specialist medicines to meet significant unmet patient needs.  See "Exhibit 6."

81.     As noted in Shire's 2016 Form 10-K, the relevant portion of which is attached

hereto as "Exhibit 7," the "One Shire model has created a simple structure and a focused,

efficient organization that is scalable for growth.  The core elements of this model have been

retained through multiple acquisitions since its original implementation."  See Exhibit "7"

(emphasis added).

82.     Since Viropharma was acquired by Shire, the business and operations of

Viropharma have been integrated into Shire.

83.     The contacts between Shire and Mr. O'Brien, the statements made by Shire, and the

integration of Viropharma into Shire also created for Mr. O'Brien a reasonable belief that,

notwithstanding any alleged corporate distinctions between the various Shire entities, defendants

acted as agents for each other with respect to the Finder's Fee Agreement.

84.     During Mr. O'Brien's meetings with Shire officials following the Shire ViroPharma

merger, Mr. O'Brien specifically advocated Dyax as a compelling, top-tier acquisition candidate

in light of (1) Shire's recently enhanced  position in HAE and the need to protect its market

position in both acute and prophylactic indications from growing competition;  (2) early clinical

work suggesting that Dyax's second generation HAE compound DX-2930 could offer the

convenience of once-monthly dosing;  (3) the capability of Dyax's Phage Display technology to

generate additional drug candidates for both its own pipeline and for partnering with other firms;

(4) the growing revenue potential of compounds in Dyax's LFRP (Licensing and Funded

Case# 2016-04721-4 Docketed at Montgomery County Prothonotary on 05/31/2016 3:43 PM, Fee = $0.00

204617523

Case# 2016-04721-4 Docketed at Montgomery County Prothonotary on 05/31/2016 3:43 PM, Fee = $0.00

Research Portfolio);  and (5) adding Dyax's drug Kalbitor to Shire's drug Firazyr would immediately give Shire virtually the entire acute HAE market..

85.    Under Mr. O'Brien's consulting agreement with ViroPharma, Mr. O'Brien prepared an extensive report on lysosomal storage disorders.

86.    At the meeting, Mr. Colpman, who was aware of that report, questioned Mr. O'Brien specifically about that field, which was at that time was, and which remains, a very important disease group to Shire.

87.    At the meeting, Mr. Colpman questioned Mr. O'Brien about which companies among those listed on Exhibit A to the Finder's Fee Agreement would be the most attractive acquisition candidates, and also asked Mr. O'Brien which companies he would add to that Exhibit A, if Mr. O'Brien could.

88.    Prior to the meeting, Mr. Fletcher had requested that Mr. O'Brien not discuss with Mr. Colpman additional potential acquisition candidates not yet on Exhibit A until the Viropharma acquisition was complete.  Mr. O'Brien agreed and did not do so.

89.    In short, because of the constant stream of information that Mr. O'Brien provided to ViroPharma, defendant Shire reaped the benefit of Mr. O'Brien's extensive advice to ViroPharma.

90.    Because the Finder's Fee Agreement remained in force, Mr. Colpman specifically requested that Mr. O'Brien refrain from suggesting any additional companies that would be added to Exhibit A to the Finder's Fee Agreement.

91.    At no time did defendant Shire notify Mr. O'Brien in writing, as required by the Finder's Fee Agreement, that defendant Shire had ceased pursuing Dyax.  Therefore, Mr. O'Brien's contract with defendant Shire prohibited him from disclosing to any third party any

19

204617523

Case# 2016-04721-4 Docketed at Montgomery County Prothonotary on 05/31/2016 3:43 PM, Fee = $0.00

information relating to Dyax or assisting any third person in any evaluation, consideration or negotiation of a transaction involving Dyax, which constituted a valuable benefit to defendant Shire. Because of the subsequent refusal by defendants to compensate Mr. O'Brien, this was to his personal detriment.

92.   In reliance upon defendant Shire continuing to honor its contracts with him, Mr. O'Brien refrained from disclosing to any third party any information relating to Dyax or assisting any third person in any evaluation, consideration or negotiation of a transaction involving Dyax, which constituted a valuable benefit to defendant Shire. Because of the subsequent refusal by defendants to compensate Mr. O'Brien, this was to his personal detriment.

93.   In several emails between Mr. O'Brien and Mr. Colpman and/or Ms. Petersen in early- to mid-2014, Ms. Petersen expressed her thanks to Mr. O'Brien for his updates on recommendations listed on Exhibit A, provided a framework for the transmission of further updates on Exhibit A listings, and promised to pass Mr. O'Brien's advice along to defendant Shire's "scouts for review." See email correspondence between Mr. O'Brien and Mr. Colpman and Ms. Petersen, attached hereto as "Exhibit 8."

94.   These communications were clear confirmation that Shire had assumed the Finder's Fee Agreement and continued to benefit from the service Mr. O'Brien continued to render in accordance with that contract.

95.   On March 31, 2015, Mr. O'Brien emailed Ms. Petersen about an unrelated matter. However, he specifically referenced "the terms of our finder's fee contract Shire assumed when you bought Viropharma." A true and correct copy of the March 31, 2015 email correspondence is attached hereto and incorporated herein as "Exhibit 9." At no time did Ms. Petersen deny that the Finder's Fee contract remained in effect or was binding on Shire.

204617523

Case# 2016-04721-4 Docketed at Montgomery County Prothonotary on 05/31/2016 3:43 PM, Fee = $0.00

96.   On July 7, 2015, Mr. O'Brien wrote to Blaine McKee, Senior Vice President and Head of Transactions at Shire, and stated: "allow me to bring to your attention Daedalus' most recent update on our recommendation of Dyax. Dyax appears on the Exhibit A list that Shire assumed with your purchase of Viropharma." A true and correct copy of the July 2015 correspondence is attached hereto and incorporated herein as "Exhibit 10."

97.   Furthermore, in his the July 7, 2015 email, Mr. O'Brien stated that he, "continue[d] to believe that Dyax's DX-2930 drug is existentially important to preserving your [defendants'] HAE franchise, a disorder that I first brought to the attention of Michel de Rosen when he was CEO of Viropharma. Today there was more good news from the FDA granting DX-2930 'breakthrough' designation. Besides HAE prophylaxis there is immediate presence in the acute sector with Dyax's Kalbitor—as well as the large footprint of Licensing and Funded Research Program (LFRP)." See "Exhibit 10."

98.   The July 7, 2015 email correspondence incorporated an earlier email that Mr. O'Brien sent to Ms. Petersen on July 1, 2015, which stated:

> I wanted to call your attention once again to the presence of Dyax on the Exhibit A list of Daedalus recommendations Shire inherited when it took over Viropharma, and its crucial importance in retaining your Hereditary Angioedema (HAE) franchise. Acquiring Dyax would immediately give you possession of Kalbitor, an acute treatment expanding your dominant HAE position.
>
> More importantly, you would also gain possession of DX-2930, the leading drug candidate in clinical development for Hereditary Angioedema. We believe this acquisition will not only eliminate an existential threat posed by Dyax to your HAE franchise, but DX-2930 is superior to the most advanced compound produced by Biocryst's oral HAE program. We do not believe Shire can afford to remain passive continuing to rely on first generation Cinryze as more effective treatments threaten your HAE position.
>
> The third important Dyax asset is the stream of royalty income from their Licensing and Funded Research Program (LFRP). This program has the

21

204617523

Case# 2016-04721-4 Docketed at Montgomery County Prothonotary on 05/31/2016 3:43 PM, Fee = $0.00

possibility of significantly expanding its payments to Dyax in the coming years as its corporate collaborators move their compounds through clinical trials to approval.

See "Exhibit 10."

99.   At no time did defendant Shire ever advise Mr. O'Brien that it was not bound by the

Finder's Fee Agreement or that the Finder's Fee Agreement was no longer in force.

100.   When the Dyax Merger (as defined below) was ultimately announced on November

2, 2015, Shire highlighted the same advantages, using the same concepts, that Mr. O'Brien had

highlighted months earlier.  Specifically, defendant Shire stressed:

**Transaction Highlights**
**DX-2930**

- Adds Dyax's DX-2930, a Phase 3-ready, long-acting injectable monoclonal antibody for HAE prophylaxis, with the potential to lower rates of HAE attacks and significantly improve patient convenience based on clinical trial data reported to date
- Offers patent protection and anticipated regulatory exclusivity beyond 2030
- Adds to Shire's best-in-class therapies addressing significant unmet patient need

**Shire and Dyax Combination**
- Combines Dyax's HAE commercial and research and development expertise with Shire's HAE leadership and proven ability to advance rare disease assets through development to commercialization
- Provides additional early-stage antibody pipeline programs for the treatment of autoimmune diseases, diabetic macular edema and thrombosis
- Adds Dyax's well-established proprietary phage display antibody generation technology to Shire's rare diseases discovery capabilities, as well as partnering revenue associated with Dyax's Licensing and Funded Research Portfolio (LFRP)

**Shire**
- Expands and extends Shire's industry-leading HAE portfolio (FIRAZYR and CINRYZE), advancing its leadership position in rare diseases and enhancing an already robust growth profile

204617523

Case# 2016-04721-4 Docketed at Montgomery County Prothonotary on 05/31/2016 3:43 PM, Fee = $0.00

- Brings potential for substantial value creation to Shire's shareholders, with significant earnings accretion expected assuming FDA approval and anticipated DX-2930 launch in 2018
- Furthers Shire's transformation to a leading global biotech and world leader in rare diseases.

See Shire Press Release, November 2, 2015, attached hereto as "Exhibit 11."

101.  According to the proxy statement later filed by Dyax in connection with the Dyax Merger (as defined below), Shire first contacted Dyax concerning a possible acquisition on September 10, 2015 just weeks after Mr. O'Brien contacted Mr. McKee and Ms. Petersen and again reiterated his recommendation that Shire should acquire Dyax.  A true and correct copy of the relevant portion of that proxy statement is attached hereto and incorporated herein as "Exhibit 12."

### The Dyax Merger and Shire's Obligations Under the Finder's Fee Agreement

102.  On or about November 2, 2015, defendant Shire plc, defendant Shire Pharmaceuticals International, Parquet Courts, Inc. and Dyax, entered into an Agreement and Plan of Merger.  Pursuant thereto,  Parquet Courts, Inc., a subsidiary created to facilitate the merger and owned by defendant Shire Pharmaceuticals International, merged into Dyax, with Dyax continuing as the surviving corporation and as a wholly-owned subsidiary of defendant Shire Pharmaceuticals International.  A true and correct copy of the Securities and Exchange Commission Form 8-K relating to the foregoing merger (the "Dyax Merger") is attached hereto and incorporated herein as "Exhibit 13."

103.  The Dyax merger became effective on January 22, 2016.  See Exhibit 13, Item 2.01 ("Completion of Acquisition or Disposition of Assets").

104.  As consideration for the Dyax Merger, Shire has thus far paid approximately $5.9 billion.  See Exhibit 13, Item 2.01.

204617523

105. In the event that the United States Food and Drug Administration ("FDA") approves the DX-2930 drug for use in treating HAE Type 1 or Type 2, on or before December 31, 2019, Shire will be required to pay an additional $646 million in additional consideration for Dyax. See Exhibit 10.1 to Exhibit 13.

106. Following the Dyax Merger, Dyax became a wholly-owned subsidiary of defendant Shire Pharmaceuticals International, which is a wholly-owned subsidiary of defendant Shire plc. See Exhibit 13, Item 2.01.

107. In connection with defendant Shire's announcement of the Dyax acquisition, defendant Shire emphasized that the key reason for the acquisition was Dyax's DX-2930 drug, which targets HAE.

108. Defendant Shire's press release on November 2, 2015 refers to defendant "Shire's HAE leadership" and defendant "Shire's industry-leading HAE portfolio (FIRAZYR and CINRYZE)." A true and correct copy of the November 2, 2015 press release is attached hereto and incorporated herein as "Exhibit 11."

109. Dr. Flemming Ornskov, M.D., defendant Shire's Chief Executive Officer, further stated that:

> DX-2930 is a strategic fit within out HAE domain expertise, and we are well-position[ed] to advance the development, registration, and commercialization of DX-2930 for the benefit of HAE patients. This transaction also offers other potential upside opportunities, including Dyax's early-stage pipeline. Following the close of this transaction, we look forward to welcoming Dyax employees, who will bring to Shire substantial clinical and commercial expertise on HAE. Dyax is to be commended for the world class organization they have built focused on HAE. I am also confident that our M & A expertise is the ongoing strength of our business will enable rapid and effective integration following the closing, as demonstrated by the success of our NPS and Viropharma acquisitions." See Exhibit 11.

Case# 2016-04721-4 Docketed at Montgomery County Prothonotary on 05/31/2016 3:43 PM, Fee = $0.00

24

204617523

110. Another Shire press release has referred to Cinryze as "one of Shire's top selling products." True and correct copies of such press releases are attached hereto as "Exhibit 14."

111. These press releases are similar to the press release issued on November 11, 2013, when defendant Shire announced the acquisition of Viropharma, which made it clear that Viropharma's ability to treat HAE with Cinryze was a key inducement for the deal. See Exhibit 15.

112. As these press releases emphasize, one of the principal motivations for the Dyax merger was to secure Shire's leadership in the HAE market – a leadership role that Shire enjoys by virtue of defendant Shire ViroPharma's ownership and/or distribution of Cinryze.

113. Mr. O'Brien had promoted Dyax to ViroPharma and then to defendant Shire on the basis that Dyax's DX-2930 drug candidate would protect defendants' significant presence in the HAE market, would enable defendants to generate substantial profits because DX-2930 treated an orphan disease, and would allow defendants to profit from Dyax's Phage Display technology and the partnerships built on that technology with some of the world's leading pharmaceutical and biotechnology firms.

114. Thus, defendant Shire acquired Dyax for the same reasons that Mr. O'Brien had promoted Dyax to both ViroPharma and defendant Shire: 1) the potential to further enhance defendant Shire ViroPharma's (and eventually defendant Shire's) leadership in HAE pharmaceuticals; and 2) to capitalize on Dyax's cutting edge Phage Display technology, and the drug candidates and partnership revenues it would bring to Dyax.

115. The business development operations of defendant Shire and its defendant subsidiaries are so intertwined that there can be no distinction between them.

Case# 2016-04721-4 Docketed at Montgomery County Prothonotary on 05/31/2016 3:43 PM, Fee = $0.00

204617523

116.  Defendant Shire, directly and through its defendant subsidiaries, is now acting as a single entity for purposes of the claims asserted in this action.

117.  Even the clinical trials leading to the approval of Cinryze for various applications, all of which ViroPharma or its predecessors performed, are now listed on clinicaltrials.gov as having been completed by defendant Shire.  True and correct copies of information from the federal clinical trials website are attached hereto and incorporated herein as "Exhibit 16."

118.  At all times following the Shire ViroPharma Merger, Mr. O'Brien reasonably believed and relied upon the fact that Shire and its defendant subsidiaries were acting as a single entity.

119.  Mr. O'Brien introduced Dyax to defendant Shire and provided detailed and significant reasons to acquire Dyax.

120.  Thanks to the information and analysis provided by Mr. O'Brien to ViroPharma and, later to defendant Shire:

    a.  ViroPharma learned about the opportunities in the HAE market, which ViroPharma later employed in acquiring Lev Pharmaceuticals, which marked ViroPharma's entry into the HAE pharmaceutical market;

    b.  Defendant Shire acquired ViroPharma, marking defendant Shire's expansion of its presence in the HAE pharmaceutical market;  and

    c.  Defendant Shire acquired Dyax, solidifying defendant Shire's position as a leader in the HAE pharmaceutical market and allowing it to capitalize on, *inter alia*:  (i)  the enhanced pricing benefits available to orphan drugs; (ii) Dyax's Phage Display technology;  (iii) Dyax's expertise in kallikrein inhibition that together with Phage Display led to the development of the second generation fully human Mab DX-2930 for HAE, as well as therapies for multiple additional orphan indications amenable to treatment with this class of therapy, such as Netherton Syndrome and Diabetic Macular Edema;  and (iv) Dyax's participation in LFRP partnerships.

26

Case# 2016-04721-4 Docketed at Montgomery County Prothonotary on 05/31/2016 3:43 PM, Fee = $0.00

204617523

121.   To the extent that defendant Shire already possessed information relating to Dyax, Mr. O'Brien brought his experience to bear and provided confirmation from a sophisticated analyzer of the biopharma market that an acquisition of Dyax would be advantageous.

122.   On December 21, 2015, counsel for Mr. O'Brien sent correspondence to Chris Allen, Esquire, the head of U.S. Litigation and Investigations for defendant Shire, outlining the facts and circumstances surrounding the Finder's Fee Agreement and the obligations thereunder triggered by defendant Shire's purchase of Dyax.  A true and correct copy of the December 21, 2015 correspondence is attached hereto and incorporated herein as "Exhibit 17."

123.   On January 26, 2016, after the closing of the Dyax Merger, Mr. O'Brien sent correspondence to Mr. Blaine McKee, enclosing an invoice for $58,987,500, which represents the balance due to Mr. O'Brien under the Finder's Fee Agreement.  A true and correct copy of the January 26, 2015 correspondence and invoice is attached hereto and incorporated herein as "Exhibit 18."

124.   To date, the amount due to Mr. O'Brien under that invoice have not been paid.

125.   The invoice also noted that Shire may still owe Mr. O'Brien an additional $6,460,000 in connection with certain Contingent Value Rights associated with the Dyax Merger.  See Exhibit 18.

126.   ViroPharma and, after the Shire/ViroPharma Merger, defendant Shire, have reaped substantial benefit from Mr. O'Brien's efforts under the Finder's Fee Agreement, and there is no basis for defendants to refuse to honor their commitments under the Finder's Fee Agreement.

## Count I:  Breach of Contract

127.   Mr. O'Brien incorporates by reference the allegations in the preceding paragraphs as though fully set forth at length herein.

27

204617523

Case# 2016-04721-4 Docketed at Montgomery County Prothonotary on 05/31/2016 3:43 PM, Fee = $0.00

Case# 2016-04721-4 Docketed at Montgomery County Prothonotary on 05/31/2016 3:43 PM, Fee = $0.00

128.   The Finder's Fee Agreement constitutes a valid contract between Mr. O'Brien and ViroPharma, which defendant Shire assumed upon or following the consummation of the Shire/ViroPharma Merger.

129.   The contract between the parties required defendant Shire to pay to Mr. O'Brien one percent of the total consideration for any transaction involving defendant Shire and any entity listed on Exhibit A to the Finder's Fee Agreement, provided that Mr. O'Brien carried out his obligations under the Finder's Fee Agreement.

130.   Mr. O'Brien satisfied all of the obligations imposed upon him by the Finder's Fee Agreement.

131.   Among the entities listed in Exhibit A of the Finder's Fee Agreement was Dyax.

132.   Defendant Shire's consummation of the Dyax Merger constituted a Transaction for purposes of the Finder's Fee Agreement, whereby defendant Shire acquired an entity identified under Exhibit A of the Finder's Fee Agreement, for which Mr. O'Brien provided all required services, and for which defendant Shire was obligated to compensate Mr. O'Brien pursuant to the Finder's Fee Agreement.

133.   At present, and despite repeated demands from Mr. O'Brien, defendant Shire has failed to make payment to Mr. O'Brien of the amount due and owing under the Finder's Fee Agreement.

134.   The failure of defendant Shire to make payment under the Finder's Fee Agreement constitutes a breach of the Finder's Fee Agreement.

135.   As a result of defendant Shire's breach of the Finder's Fee Agreement, Mr. O'Brien has sustained damages in the current amount of $58,987,500, plus pre-judgment interest.

28

204617523

WHEREFORE, plaintiff, Bruce G. O'Brien d/b/a Daedalus Biotech Advisors respectfully requests judgment in his favor and against defendants in the amount of $58,987,500, costs, plus pre- and post-judgment interest at the statutory interest rate, together with such other and further relief as this Court may deem proper.

<u>**Count II: Unjust Enrichment**</u>

136.  Mr. O'Brien incorporates by reference the allegations in the preceding paragraphs as though the same were fully set forth at length herein.

137.  The Finder's Fee Agreement conferred a number of substantial and valuable benefits upon Shire, including but not limited to Mr. O'Brien's services in identifying, investigating, evaluating, analyzing, and providing information to Shire with respect to various acquisition targets.

138.  The benefits conferred upon Shire by the Finder's Fee Agreement also included restrictions upon Mr. O'Brien's ability to use his expertise and provide the same services to other entities that may have been interested in pursuing a transaction with Dyax and the other entities identified by Mr. O'Brien on Exhibit A of the Finder's Fee Agreement.

139.  Defendant Shire retained these benefits, and never rejected or terminated the Finder's Fee Agreement, pursuant to the termination provisions of the Finder's Fee Agreement or otherwise.

140.  Following the Shire/ViroPharma Merger, defendant Shire continued to retain and accept the numerous, valuable benefits conferred by Mr. O'Brien, without compensating him.

141.  In fact, defendant Shire continued to reaffirm the validity of the Finder's Fee Agreement.

29

Case# 2016-04721-4 Docketed at Montgomery County Prothonotary on 05/31/2016 3:43 PM, Fee = $0.00

142.  Defendant Shire has refused to satisfy its obligations under the Finder's Fee Agreement, without cause or privilege for such refusal.

143.  Defendant Shire's retention of the benefits conferred upon it by the Finder's Fee Agreement is unjust.

144.  Mr. O'Brien has sustained damages as a result of defendant Shire's unjust retention of the benefits provided under the Finder's Fee Agreement.

WHEREFORE, plaintiff, Bruce G. O'Brien d/b/a Daedalus Biotech Advisors respectfully requests judgment in his favor and against the defendants in the amount of $58,987,500, costs, plus pre- and post-judgment interest at the statutory interest rate, together with such other and further relief as this Court may deem proper.

### Count III:  Declaratory Judgment

145.  Mr. O'Brien incorporates by reference the allegations in the preceding paragraphs as though fully set forth at length herein.

146.  Pursuant to the Finder's Fee Agreement, defendant Shire currently owes Mr. O'Brien $58,987,500, plus pre-judgment interest at the statutory rate of interest, on account of the closing of the Dyax Merger.

147.  The Dyax Merger included potential future payments by defendant Shire in connection with the Contingent Value Rights Agreement included as part of the Dyax Merger Agreement, in the amount of $646 million.

148.  Those payments are to be made in the event that the DX-2930 drug receives the approval of the U.S. Food and Drug Administration ("FDA") for prevention of HAE types 1 and 2 by December 31, 2019.

Case# 2016-04721-4 Docketed at Montgomery County Prothonotary on 05/31/2016 3:43 PM, Fee = $0.00

204617523

149.  In the event that such Contingent Value Rights ultimately vest, Mr. O'Brien is entitled to payment from defendant Shire in the amount of $6.46 million.

150.  Mr. O'Brien seeks a declaration that, should the FDA approve the DX-2930 drug for prevention of HAE types 1 and 2 on or before December 31, 2019, Mr. O'Brien is entitled to an additional payment of $6.46 million, pursuant to the Finder's Fee Agreement.

WHEREFORE, plaintiff, Bruce G. O'Brien d/b/a Daedalus Biotech Advisors respectfully requests declaratory judgment that should the FDA approve the DX-2930 drug for prevention of HAE types 1 and 2 on or before December 31, 2019, Mr. O'Brien is entitled to an additional payment of $6.46 million, pursuant to the Finder's Fee Agreement, together with such other and further relief as this Court may deem proper.

Respectfully submitted,

CLARK HILL PLC

Dated: May 31, 2016

/s/ Jonathan W. Hugg
Jonathan W. Hugg
Pa. Id. No. 73589
Samuel A. Hornak
Pa. Id. No. 312360
Jonathan D. Klein
Pa. Id. No. 309967
2005 Market Street, Suite 1000
Philadelphia PA, 19103
(215) 640-8500

*Attorneys for Plaintiff,*
*Bruce G. O'Brien d/b/a*
*Daedalus Biotech Advisors*

204617523

Case# 2016-04721-4 Docketed at Montgomery County Prothonotary on 05/31/2016 3:43 PM, Fee = $0.00

Case# 2016-04721-4 Docketed at Montgomery County Prothonotary on 05/31/2016 3:43 PM, Fee = $0.00

## VERIFICATION

I, Bruce G. O'Brien, verify that, based upon my personal knowledge, information and belief, the facts in the foregoing Complaint are true and correct and that I understand that false statements herein are made subject to the penalties of 18 Pa. C.S. §4904, relating to unsworn falsification to authorities.

Date: _May 26, 2016_

_Bruce G. O'Brien_
Bruce G. O'Brien

204617523

32

Case# 2016-04721-4 Docketed at Montgomery County Prothonotary on 05/31/2016 3:43 PM, Fee = $0.00

| | |
|---|---|
| **CLARK HILL PLC**<br>JONATHAN W. HUGG, ESQ.<br>(Pa. Id. No. 73589)<br>jhugg@clarkhill.com<br>SAMUEL A. HORNAK, ESQ.<br>(Pa. Id. No. 312360)<br>shornak@clarkhill.com<br>JONATHAN D. KLEIN, ESQ.<br>(Pa. Id. No. 309967)<br>jklein@clarkhill.com<br>One Commerce Square<br>2005 Market Street, Suite 1000<br>Philadelphia, PA 19103<br>(215) 640-8500 (Telephone)<br>(215) 640-8501 (Facsimile) | *Attorneys for Plaintiff,*<br>*Bruce G. O'Brien d/b/a*<br>*Daedalus Biotech Advisors* |
| BRUCE G. O'BRIEN d/b/a<br>DAEDALUS BIOTECH ADVISORS,<br><br>           Plaintiff,<br><br>           v.<br><br>SHIRE, SHIRE PLC,<br>SHIRE PHARMACEUTICAL HOLDINGS<br>IRELAND LIMITED,<br>SHIRE PHARMACEUTICALS<br>INTERNATIONAL, and<br>SHIRE VIROPHARMA INCORPORATED,<br><br>           Defendants | COURT OF COMMON PLEAS OF<br>MONTGOMERY COUNTY,<br>PENNSYLVANIA<br><br><br><br>NO. 2016-4721<br><br>JURY TRIAL DEMANDED |

## INDEX OF EXHIBITS

| Exhibit No. | Page | Exhibit Name |
|---|---|---|
| Exhibit 1 | 1 | Daedalus Biotech Advisors Finder's Fee Agreement Dated June 2007 |
| Exhibit 2 | 7 | Daedalus Biotech Advisors Amended and Restated Finder's Fee Agreement Dated November 29, 2012 |
| Exhibit 2A | 17 | Amended Exhibit A to Daedalus Biotech Advisors Amended and Restated Finder's Fee Agreement, Dated January 2014 |
| Exhibit 3 | 24 | Information on Dyax Corporation, Dated June 21, 2006 |

1

204603266

Case# 2016-04721-4 Docketed at Montgomery County Prothonotary on 05/31/2016 3:43 PM, Fee = $0.00

Exhibit 4    32    Consulting Agreement Between Daedalus Biotech Advisors and ViroPharma Incorporated, dated November 29, 2012, Including Amendments Thereto

Exhibit 5    40    Agreement and Plan of Merger Between Shire Pharmaceutical Holdings Ireland Limited, Venus Newco, Inc., ViroPharma Incorporated and Shire PLC, dated November 11, 2013, In Relevant Part

Exhibit 6    59    Shire Press Release, "Shire Updates n Reorganisation Programme," Dated November 7, 2013

Exhibit 7    63    Shire's 2016 Form 10-K, In Relevant Part

Exhibit 8    70    Email Communications Between Plaintiff and Shire Officials, Dated February 4, 2014; March 25, 2014; April 2, 2014; and May 8, 2014

Exhibit 9    79    Email Communication Between Plaintiff and Shire Officials, Dated March 31, 2015

Exhibit 10   82    Email Communication Between Plaintiff and Shire Officials, Dated July 1, 2015 and July 7, 2015.

Exhibit 11   85    Shire Press Release, "Shire to Acquire Dyax Corp, expanding and extending industry-leading Hereditary Angiodema (HAE) portfolio," November 2, 2015

Exhibit 12   96    Proxy Statement of Dyax Corp., Schedule 14-A, Dated December 14, 2015, In Relevant Part

Exhibit 13   105   Shire Form 8-K, Dated January 22, 2016, In Relevant Part

Exhibit 14   138   Shire Press Release, "Shire to Attain Enhanced CINRYZE® Manufacturing Flexibility and Capacity," Dated August 25, 2015

Exhibit 15   143   Shire Press Release, "Shire to acquire ViroPharma in strategic move to strengthen rare disease portfolio; will augment already strong growth prospects," Dated November 11, 2013

Exhibit 16   153   Information Relating to Clinical Trials Regarding CINRYZE® And Attributed to Shire

Exhibit 17   166   Correspondence from Plaintiff's Counsel to Shire, Dated December 21, 2015

Exhibit 18   171   Correspondence from Plaintiff to Shire, Enclosing Invoice, Dated January 26, 2016

204603266

Case# 2016-04721-4 Docketed at Montgomery County Prothonotary on 05/31/2016 3:43 PM, Fee = $0.00

# EXHIBIT 1

Case# 2016-04721-4 Docketed at Montgomery County Prothonotary on 05/31/2016 3:43 PM, Fee = $0.00

DAEDALUS BIOTECH ADVISORS

FINDER'S FEE AGREEMENT

This letter agreement (the "Agreement") sets forth the basis on which Bruce G. O'Brien d/b/a Daedalus Biotech Advisors ("Daedalus") is engaged by the company identified on the signature page hereof (the "Company") to assist the Company in connection with a proposed acquisition of or other substantial transaction (a "Transaction") involving one or more pharmaceutical compounds or technologies ("Targets") or companies involved with one or more pharmaceutical compounds or technologies, including any Target (a "Development Firm") each as identified or to be identified on Exhibit A.

I.      Services to be Performed

For each Target or Development Firm, Daedalus is prepared to provide the following services, which will be primarily performed by Bruce G. O'Brien:

A)      Disclose the name and purpose of the Target or Development Firm to the Company in writing to the Company's Chief Executive Officer with a copy to the Company's Vice President of Business Development. If Company, or any of its agents, has previously engaged in discussions with senior management of the Development Firm regarding a Transaction relating to that Target, Company will promptly, and in any event within five business days, so advise Daedalus and the parties shall not list such Target or Development Firm on Exhibit A. If the Company does not so advise Daedalus, then the Target or Development Firm shall be added to Exhibit A; one party will notify the other in writing (including by email) each time a Target or Development Firm is added to Exhibit A. No fee shall be payable by Company to Daedalus pursuant to this Agreement unless the Target and / or Development Firm are identified on Exhibit A.

B)      Once a Target or Development Firm has been added to Exhibit A, deliver to the Company a written analysis of the therapeutic area, development / regulatory status, sales and marketing efforts, exclusivity proposition regarding the Target or Development Firm and an explanation why Daedalus believes Target or Development Firm would be a good candidate for a Transaction based upon the information in Daedalus' possession, provided however that Daedalus shall make reasonable efforts to consider information which is publicly available. If requested by the Company, this information would be presented in person to members of the Company's management at the Company's offices in Exton, PA.

C)      When requested by the Company, contact the Development Firm by telephone and introduce the Company's CEO to senior management of the Development Firm. To the extent reasonably requested by the Company, Daedalus will attend up to three meetings of the Company's management for the purpose of evaluating the Target or Development Firm and any proposed Transaction and, if requested by the Company, will also attend meetings between the Company and the Development Firm.

Daedalus is not being engaged by the Company for assistance in valuation of the Target or Development Firm, in negotiating a Transaction with the Development Firm or in advising the Company on how to structure any Transaction from a financial point of view. If requested by the Company, Daedalus may offer its opinion on some of those issues, but the Company is not retaining it for that purpose. If the Company requests Daedalus to prepare reports or perform research or other services not

2

Case# 2016-04721-4 Docketed at Montgomery County Prothonotary on 05/31/2016 3:43 PM, Fee = $0.00

described above, and Daedalus agrees to do so, such services will be the subject of a separate agreement. The Company has no obligation to pursue or engage in any Transaction, even if Daedalus has performed all of the services requested by the Company.

II.   Compensation for Services

If: (a) the Company has not previously engaged in discussions with senior management of the Development Firm regarding a Transaction involving the Target or the Development Firm, and (b) a Transaction is during the Fee Period as defined below, Company shall pay Daedalus a fee in cash equal to one percent of the total consideration paid by the Company pursuant to Agreements entered into during the Fee Period in connection with the Transaction (as further defined below, the "Consideration"). For each Target or Development Firm listed on Exhibit A, the "Fee Period" is the period from the date the Target or Development Firm is listed on Exhibit A to the later of (i) two years after the Company first advises Daedalus pursuant to Section III(E) that it is no longer actively considering a Transaction involving such Target or Development Firm  or (ii) if, before the end of the two year period described in clause (i), Company has engaged in a Transaction involving the Target or Development Firm, four years from the date of such Transaction.  Whether or not a Transaction is consummated, the Company will also reimburse Daedalus for any travel or other expenses reasonably incurred by Daedalus in connection with his services hereunder that have been approved in advance by the Company. Daedalus will not incur any expenses without approval from the Company. Notwithstanding anything in this Agreement that may be deemed to be the contrary, if a Development Firm enters into a transaction regarding a Target with a third party not listed on Exhibit A that is unrelated to Company (a "Third Party"), and Company at any time enters into a transaction with such Third Party, then such transaction between Company and the Third Party shall not be a "Transaction" for purposes of this Agreement, and Company shall have no obligation to pay Daedalus any amount in respect of Company's transaction with any Third Party.

Consideration shall include  the total amount paid by the Company to the Development Firm or its shareholders or others, whether such payments take the form of cash, and/or common stock, preferred stock or debt issued by the Company.  In the event that the aggregate consideration for a Transaction by the Company consists in whole or in part of stock, for the purposes of calculating the amount of aggregate consideration, the value of such securities will be (in the case of the existence of a public trading market therefor) the average bid or closing prices for the twenty business days preceding the issuance of the stock in the Transaction, or (in the absence of a public trading market thereof) the fair market value thereof as the Company and Daedalus agree on the day preceding the issuance of the stock in the Transaction. If the value of the stock needs to be determined, pursuant to the next paragraph, on more than one occasion in connection with the Transaction, the value of the stock will be determined in such manner with respect to the days on which such stock is issued.

Subject to the terms of this Agreement, at closing, Daedalus will be paid fees based on the total calculated Consideration, even if the total amount of Consideration is not paid at closing.  For example, if Company agrees to pay a portion of the Consideration (for example, in the form of a note) over an agreed upon period (such as 3-5 years), Daedalus will be paid this total calculable Consideration at closing based on the stated terms of such Consideration (but not including interest payable in the future), without regard to whether payments are ultimately made.  The only exception will be if a portion of the Consideration is incalculable at closing (such as an earn-out, royalties, payments contingent on future sales, milestone payments, or other incentives based on future performance, etc.).  In that case, that portion, and only that portion, of Daedalus' fees relating to such incalculable Consideration shall be paid to Daedalus if and when that portion of the Consideration is payable.

3

Case# 2016-04721-4 Docketed at Montgomery County Prothonotary on 05/31/2016 3:43 PM, Fee = $0.00

III.     Daedalus Representations and Covenants

A.     Daedalus shall keep confidential and shall not disclose to any third person, all information (a) that is disclosed by the Company to Daedalus that is not in the public domain, (b) relating to this Agreement, including the fact that the Company has entered into this Agreement with Daedalus; and (c) that is later developed by Daedalus regarding Target in connection with the Company's evaluation and/or pursuit of the Transaction (collectively, "Information"). Daedalus shall use the Information only to assist the Company in evaluating and consummating the Transaction. Daedalus' obligations in clauses (a), (b) and (c) shall survive the termination of this Agreement.

B.     The execution, delivery and performance of this Agreement does not and will not violate any agreement to which Daedalus is a party.

C.     Daedalus represents that Daedalus has not been debarred under the provisions of the Generic Drug Enforcement Act of 1992, including without limitation, 21 U.S.C. Section 335a. If, at any time during the term of this Agreement, Daedalus (a) becomes debarred, or (b) receives notice of action or threat of action with respect to its debarment, Daedalus shall notify Company immediately. If Daedalus becomes debarred, this Agreement shall terminate automatically without any further action or notice by Company. If Daedalus receives notice as set forth in clause (b) above, Company shall have the right to terminate this Agreement immediately.

D.     Daedalus is not a registered broker/dealer, is not affiliated with a registered broker/dealer, and nothing in this Agreement would require Daedalus to register as a broker/dealer.

E.     For four weeks after the date the Target or Development Firm on Exhibit A is first disclosed to the Company, Daedalus shall not disclose to any third party any information relating to the Transaction or the Target, and shall not assist any third person in any evaluation, consideration or negotiation of a Transaction (or any other transaction) involving the Target or Development Firm. This restriction shall continue after such four-week period if prior to the end thereof, the Company has authorized Daedalus pursuant to Section 1(c) hereof to contact the Development Firm and thereafter until Company notifies Daedalus in writing that Company is not pursuing such Target or Development Firm. In the event that Company ceases the active pursuit of the Target or Development Firm, it shall promptly notify Daedalus in writing.

F.     Daedalus is aware of the federal and state securities laws, regulations and rules that would prohibit Daedalus from trading in the securities of the Company or the Development Firm while Daedalus is in possession of material undisclosed information, and Daedalus shall not take any action that would violate any such law, regulation or rule.

VI.     Indemnification

Recognizing that transactions of the type contemplated by this Agreement sometimes result in litigation and that Daedalus' role is advisory only, the Company agrees to indemnify Daedalus, its agents and affiliates (the "Daedalus Indemnified Parties") against any suits, losses, claims and/or damages and/or liabilities, joint and several, including shareholder actions, to which the Daedalus Indemnified Parties may be subject in connection with the services rendered, and to reimburse the Daedalus Indemnified Parties for any reasonable legal or other expenses incurred by them in connection therewith. However, the Company shall not be responsible for any loss claim, damage or liability resulting from the negligence, willful misfeasance or gross negligence of a Daedalus Indemnified Parties. Daedalus shall indemnify the Company, its officers, directors, agents and affiliates (the "Company Indemnified Parties") against any suits, losses, claims and/or damages and/or liabilities, joint and several, including shareholder

4

Case# 2016-04721-4 Docketed at Montgomery County Prothonotary on 05/31/2016 3:43 PM, Fee = $0.00

actions, to which the Company Indemnified Parties may be subject in connection with any breach by Daedalus of any of his representations, warranties or covenants hereunder, and to reimburse the Company Indemnified Parties for any reasonable legal or other expenses incurred by them in connection therewith. Daedalus' obligation to indemnify the Company Indemnified Parties shall not exceed the total amount paid to Daedalus hereunder.

VII.   Termination

This Agreement may be terminated by either party at any time, provided that if Daedalus has disclosed a Target or Development Firm to the Company prior to such termination, the Company's obligations to pay the fees due hereunder shall continue and apply with respect to any Transaction consummated in the manner, and subject to the limitations described in Section II above.

VIII.   Governing Law; Other

This Agreement shall be governed by the laws of the Commonwealth of Pennsylvania. Daedalus is an independent contractor. Nothing contained in this Agreement shall create or imply the creation of a partnership or employment relationship between the Company and Daedalus. Neither party shall have any authority to bind the other. This Agreement sets forth the entire understanding of the parties relating to the subject matter hereof, and supersedes and cancels any prior communications, understandings, and agreements between the parties. This Agreement cannot be modified or changed nor can any of its provisions be waived, except by a writing signed by all parties.

Executed as of the date set forth below, intending to be legally bound hereby.

Daedalus Biotech Advisors

By: _____
Bruce G. O'Brien, President

COMPANY

ViroPharma Incorporated

By: _____

Date: June _____, 2007

5

Case# 2016-04721-4 Docketed at Montgomery County Prothonotary on 05/31/2016 3:43 PM, Fee = $0.00

Exhibit A

The first Target is a compound currently under development by Schering-Plough by the name of Pradefovir.  Company acknowledges that Daedalus introduced the initial Target to the Company and that the Company has considered a Transaction involving that Target for which Daedalus has already provided the services described in Section 1 of the Agreement.

Other Development Companies already identified:

Dyax
Metabasis
Haptogen
Xenoport

6

Case# 2016-04721-4 Docketed at Montgomery County Prothonotary on 05/31/2016 3:43 PM, Fee = $0.00

# EXHIBIT 2

Case# 2016-04721-4 Docketed at Montgomery County Prothonotary on 05/31/2016 3:43 PM, Fee = $0.00

DAEDALUS BIOTECH ADVISORS

AMENDED AND RESTATED FINDER'S FEE AGREEMENT

This letter agreement (the "Agreement") sets forth the basis on which Bruce G. O'Brien d/b/a Daedalus Biotech Advisors ("Daedalus") is engaged by the company identified on the signature page hereof (the "Company") to assist the Company in connection with a proposed acquisition of or other substantial transaction (a "Transaction") involving one or more pharmaceutical compounds or technologies ("Targets") or companies involved with one or more pharmaceutical compounds or technologies, including any Target (a "Development Firm") each as identified or to be identified on Exhibit A. The parties acknowledge that Daedalus and Company are parties to a previously executed Consulting Agreement dated June 2007 (the "Prior Agreement") and that the parties desire to amend and restate the Prior Agreement in its entirety as set forth herein.

I.      Services to be Performed

        For each Target or Development Firm, Daedalus is prepared to provide the following services, which will be primarily performed by Bruce G. O'Brien:

A)      Disclose the name and purpose of the Target or Development Firm to the Company in writing to the Company's Chief Executive Officer with a copy to the Company's Vice President of Business Development. If Company, or any of its agents, has previously engaged in discussions with senior management of the Development Firm regarding a Transaction relating to that Target, Company will promptly, and in any event within five business days, so advise Daedalus and the parties shall not list such Target or Development Firm on Exhibit A. If the Company does not so advise Daedalus, then the Target or Development Firm shall be added to Exhibit A; one party will notify the other in writing (including by email) each time a Target or Development Firm is added to Exhibit A. No fee shall be payable by Company to Daedalus pursuant to this Agreement unless the Target and / or Development Firm are identified on Exhibit A.

B)      Once a Target or Development Firm has been added to Exhibit A, deliver to the Company a written analysis of the therapeutic area, development / regulatory status, sales and marketing efforts, exclusivity proposition regarding the Target or Development Firm and an explanation why Daedalus believes Target or Development Firm would be a good candidate for a Transaction based upon the information in Daedalus' possession, provided however that Daedalus shall make reasonable efforts to consider information which is publicly available. If requested by the Company, this information would be presented in person to members of the Company's management at the Company's offices in Exton, PA.

C)      When requested by the Company, contact the Development Firm by telephone and introduce the Company's CEO to senior management of the Development Firm. To the extent reasonably requested by the Company, Daedalus will attend up to three meetings of the Company's management for the purpose of evaluating the Target or Development Firm and any proposed Transaction and, if requested by the Company, will also attend meetings between the Company and the Development Firm.

        Daedalus is not being engaged by the Company for assistance in valuation of the Target or Development Firm, in negotiating a Transaction with the Development Firm or in advising the Company on how to structure any Transaction from a financial point of view. If requested by the Company,

Case# 2016-04721-4 Docketed at Montgomery County Prothonotary on 05/31/2016 3:43 PM, Fee = $0.00

Daedalus may offer its opinion on some of those issues, but the Company is not retaining it for that purpose. If the Company requests Daedalus to prepare reports or perform research or other services not described above, and Daedalus agrees to do so, such services will be the subject of a separate agreement. The Company has no obligation to pursue or engage in any Transaction, even if Daedalus has performed all of the services requested by the Company.

II.    Compensation for Services

Concurrently with the execution hereof, the Company shall pay Daedalus $12,500. This amount shall be treated as a nonrefundable advance payment against any fees owed by the Company to Daedalus for a Transaction in which a fee is payable pursuant to the following paragraph. In the event the fees due to Daedalus on such Transaction exceed $12,500 then only the excess over that amount will be payable by the Company.

If: (a) the Company has not previously engaged in discussions with senior management of the Development Firm regarding a Transaction involving the Target or the Development Firm, and (b) a Transaction is during the Fee Period as defined below, Company shall pay Daedalus a fee in cash equal to one percent of the total consideration paid by the Company pursuant to Agreements entered into during the Fee Period in connection with the Transaction (as further defined below, the "Consideration"). For each Target or Development Firm listed on Exhibit A, the "Fee Period" is the period from the date the Target or Development Firm is listed on Exhibit A to the later of (i) two years after the Company first advises Daedalus pursuant to Section III(E) that it is no longer actively considering a Transaction involving such Target or Development Firm or (ii) if, before the end of the two year period described in clause (i), Company has engaged in a Transaction involving the Target or Development Firm, four years from the date of such Transaction. Whether or not a Transaction is consummated, the Company will also reimburse Daedalus for any travel or other expenses reasonably incurred by Daedalus in connection with his services hereunder that have been approved in advance by the Company. Daedalus will not incur any expenses without approval from the Company. Notwithstanding anything in this Agreement that may be deemed to be the contrary, if a Development Firm enters into a transaction regarding a Target with a third party not listed on Exhibit A that is unrelated to Company (a "Third Party"), and Company at any time enters into a transaction with such Third Party, then such transaction between Company and the Third Party shall not be a "Transaction" for purposes of this Agreement, and Company shall have no obligation to pay Daedalus any amount in respect of Company's transaction with any Third Party.

Consideration shall include the total amount paid by the Company to the Development Firm or its shareholders or others, whether such payments take the form of cash, and/or common stock, preferred stock or debt issued by the Company. In the event that the aggregate consideration for a Transaction by the Company consists in whole or in part of stock, for the purposes of calculating the amount of aggregate consideration, the value of such securities will be (in the case of the existence of a public trading market therefor) the average bid or closing prices for the twenty business days preceding the issuance of the stock in the Transaction, or (in the absence of a public trading market thereof) the fair market value thereof as the Company and Daedalus agree on the day preceding the issuance of the stock in the Transaction. If the value of the stock needs to be determined, pursuant to the next paragraph, on more than one occasion in connection with the Transaction, the value of the stock will be determined in such manner with respect to the days on which such stock is issued.

Subject to the terms of this Agreement, at closing, Daedalus will be paid fees based on the total calculated Consideration, even if the total amount of Consideration is not paid at closing. For example, if Company agrees to pay a portion of the Consideration (for example, in the form of a note) over an agreed

9

Case# 2016-04721-4 Docketed at Montgomery County Prothonotary on 05/31/2016 3:43 PM, Fee = $0.00

upon period (such as 3-5 years), Daedalus will be paid this total calculable Consideration at closing based on the stated terms of such Consideration (but not including interest payable in the future), without regard to whether payments are ultimately made. The only exception will be if a portion of the Consideration is incalculable at closing (such as an earn-out, royalties, payments contingent on future sales, milestone payments, or other incentives based on future performance, etc.). In that case, that portion, and only that portion, of Daedalus' fees relating to such incalculable Consideration shall be paid to Daedalus if and when that portion of the Consideration is payable.

III.     Daedalus Representations and Covenants

     A.     Daedalus shall keep confidential and shall not disclose to any third person, all information (a) that is disclosed by the Company to Daedalus that is not in the public domain, (b) relating to this Agreement, including the fact that the Company has entered into this Agreement with Daedalus; and (c) that is later developed by Daedalus regarding Target in connection with the Company's evaluation and/or pursuit of the Transaction (collectively, "Information"). Daedalus shall use the Information only to assist the Company in evaluating and consummating the Transaction. Daedalus' obligations in clauses (a), (b) and (c) shall survive the termination of this Agreement.

     B.     The execution, delivery and performance of this Agreement does not and will not violate any agreement to which Daedalus is a party.

     C.     Daedalus represents that Daedalus has not been debarred under the provisions of the Generic Drug Enforcement Act of 1992, including without limitation, 21 U.S.C. Section 335a. If, at any time during the term of this Agreement, Daedalus (a) becomes debarred, or (b) receives notice of action or threat of action with respect to its debarment, Daedalus shall notify Company immediately. If Daedalus becomes debarred, this Agreement shall terminate automatically without any further action or notice by Company. If Daedalus receives notice as set forth in clause (b) above, Company shall have the right to terminate this Agreement immediately.

     D.     Daedalus is not a registered broker/dealer, is not affiliated with a registered broker/dealer, and nothing in this Agreement would require Daedalus to register as a broker/dealer. Consultant represents and warrants that it is fully aware of the broker/dealer registration requirements and hereby covenants that it will continually monitor such requirements during the Term.

     E.     For four weeks after the date the Target or Development Firm on Exhibit A is first disclosed to the Company, Daedalus shall not disclose to any third party any information relating to the Transaction or the Target, and shall not assist any third person in any evaluation, consideration or negotiation of a Transaction (or any other transaction) involving the Target or Development Firm. This restriction shall continue after such four-week period if prior to the end thereof, the Company has authorized Daedalus pursuant to Section 1(e) hereof to contact the Development Firm and thereafter until Company notifies Daedalus in writing that Company is not pursuing such Target or Development Firm. In the event that Company ceases the active pursuit of the Target or Development Firm, it shall promptly notify Daedalus in writing.

     F.     Daedalus is aware of the federal and state securities laws, regulations and rules that would prohibit Daedalus from trading in the securities of the Company or the Development Firm while Daedalus is in possession of material undisclosed information, and Daedalus shall not take any action that would violate any such law, regulation or rule.

VI.     Indemnification

Recognizing that transactions of the type contemplated by this Agreement sometimes result in litigation and that Daedalus' role is advisory only, the Company agrees to indemnify Daedalus, its agents and affiliates (the "Daedalus Indemnified Parties") against any suits, losses, claims and/or damages and/or liabilities, joint and several, including shareholder actions, to which the Daedalus Indemnified Parties may be subject in connection with the services rendered, and to reimburse the Daedalus Indemnified Parties for any reasonable legal or other expenses incurred by them in connection therewith. However, the Company shall not be responsible for any loss claim, damage or liability resulting from the negligence, willful misfeasance or gross negligence of a Daedalus Indemnified Parties. Daedalus shall indemnify the Company, its officers, directors, agents and affiliates (the "Company Indemnified Parties") against any suits, losses, claims and/or damages and/or liabilities, joint and several, including shareholder actions, to which the Company Indemnified Parties may be subject in connection with any breach by Daedalus of any of his representations, warranties or covenants hereunder, and to reimburse the Company Indemnified Parties for any reasonable legal or other expenses incurred by them in connection therewith. Daedalus' obligation to indemnify the Company Indemnified Parties shall not exceed the total amount paid to Daedalus hereunder.

VII.    Termination

This Agreement may be terminated by either party at any time, provided that if Daedalus has disclosed a Target or Development Firm to the Company prior to such termination, the Company's obligations to pay the fees due hereunder shall continue and apply with respect to any Transaction consummated in the manner, and subject to the limitations described in Section II above.

VIII.   Governing Law; Other

This Agreement shall be governed by the laws of the Commonwealth of Pennsylvania. Daedalus is an independent contractor. Nothing contained in this Agreement shall create or imply the creation of a partnership or employment relationship between the Company and Daedalus. Neither party shall have any authority to bind the other. This Agreement sets forth the entire understanding of the parties relating to the subject matter hereof, and supersedes and cancels any prior communications, understandings, and agreements between the parties, including, without limitation, the Prior Agreement. This Agreement cannot be modified or changed nor can any of its provisions be waived, except by a writing signed by all parties. Each party agrees that it will not, except with the prior written consent of the other party, which such consent shall not be unreasonably withheld, assign, sell, transfer, delegate or otherwise dispose of, whether voluntarily or involuntarily, or by operation of law, any rights or obligations under this Agreement. Any purported assignment, transfer, or delegation, except as permitted herein, shall be null and void. Notwithstanding the foregoing, nothing in this Agreement shall prevent the consolidation of either party, or its merger into, any other corporation, or the sale by either party of all or substantially all of its properties or assets, or the assignment by either party of this Agreement and the performance of its obligations hereunder to any successor in interest. Subject to the foregoing, this Agreement shall be binding upon and shall inure to the benefit of the parties and their respective successors, and permitted assigns, and shall not benefit any person or entity other than those enumerated above.

Executed as of the date set forth below, intending to be legally bound hereby.

Case# 2016-04721-4 Docketed at Montgomery County Prothonotary on 05/31/2016 3:43 PM, Fee = $0.00

Daedalus Biotech Advisors

By: _____
Bruce G. O'Brien, President

COMPANY

ViroPharma Incorporated

By: _____

Date: November 29, 2012

Case# 2016-04721-4 Docketed at Montgomery County Prothonotary on 05/31/2016 3:43 PM, Fee = $0.00

12

Case# 2016-04721-4 Docketed at Montgomery County Prothonotary on 05/31/2016 3:43 PM, Fee = $0.00

Corrected Exhibit A (February 2012) Viropharma – Daedalus Biotech Advisors

Corrected November 17, 2012

1.     Dyax

2.     Metabasis

3.     Haptogen

4.     Xenoport

5.     Enanta

6.     Dynogen

7.     Y's Therapeutics

8.     Osiris

9.     Midway Pharmaceuticals

10.    Nabriva Therapeutics

11.    Taigen Biotechnology

12.    LifeCycle Pharma A/S

13.    Acambis

14.    Cangene

15.    Pacgen

16.    Sucampo

17.    Tanabe Seiyaku

18.    NanoBio

19.    Toyoma Chemical

20.    Trius

21.    AGI Therapeutics

22.    Pharming NV

23.    Pipex

13

Case# 2016-04721-4 Docketed at Montgomery County Prothonotary on 05/31/2016 3:43 PM, Fee = $0.00

24. Kenta Biotech
25. Geistlich Pharma AG
26. Henogen SA
27. Cellerix
28. Kiadis
29. Cosmo Pharmaceuticals
30. Rigel Pharmaceuticals
31. Ariad
32. Chelsea Therapeutics
33. Cortex
34. Archemix
35. Incyte
36. Jazz Pharmaceuticals
37. Avanir Pharmaceuticals
38. Amicus Therapeutics
39. FOLDRx
40. Keryx
41. Aeterna Zentaris
42. Alkermes (Vivitro)
43. Aerovance
44. Anacor Pharmaceuticals
44. QuatRx
45. Tranzyme Pharma
46. Trubion Pharmaceuticals
47. Ironwood

Case# 2016-04721-4 Docketed at Montgomery County Prothonotary on 05/31/2016 3:43 PM, Fee = $0.00

48. Relypsa

49. KaloBios

50. Proteon Therapeutics

51. YM Biosciences

52. Carbaglu (Recordati/Orphan Europe)

53. Acadia Pharmaceuticals

54. Acceleron Pharma

55. Ocera

56. Celsion

57. Prana Biotechnology

58. Ikaria Holdings (terlipressin)

59. BioAlliance Pharma

60. Ferring (terlipressin)

61. Sinclair IS Pharma

62. Titan Pharmaceuticals

63. Neuran Pharmaceuticals

64. Edison Pharmaceuticals

65. Pfizer/King divestiture products

    a)  Cyanokit Auto-Injector 5g (hydroxocobalamin for injection) – Cyanide Poisoning

    b)  DuoDote Auto-Injector (atropine & pralidoxime chloride) – Nerve Agent Exposure.  Meridian has recently received an order from the US Government for an order for DuoDote in excess of $100 million.

    c)  Thrombin JMI (bovine-derived hemostat)

    d)  Thrombi-Gel (thrombin/gelatin foam hemostat) - Gel for moderately to severely bleeding wounds.

    e)  Thrombi-Pad (3x3 hemostatic pad) - Sterile trauma dressing for moderately to severely bleeding wounds.

66. SigmaPharma

67.    Marinus

68.    Biocryst

These are the firms that should be listed presently on Exhibit A of the Viropharma – Daedalus Biotech Advisors contract.

Although a number of these firms have been taken over, I have retained them on the list in the (unlikely) event of a spinout making them once more a possible acquisition or partnership target.

---

69.    (11/17/12)  Dexamethasone -- Rett Syndrome -- Clinical work at Johns Hopkins.  Repositioned Compound.

70.    (11/17/12)  Mecasermin -- Rett Syndrome -- Childrens Hospital of Boston.  Repositioned Compound.

Case# 2016-04721-4 Docketed at Montgomery County Prothonotary on 05/31/2016 3:43 PM, Fee = $0.00

Case# 2016-04721-4 Docketed at Montgomery County Prothonotary on 05/31/2016 3:43 PM, Fee = $0.00

# EXHIBIT 2A

Case# 2016-04721-4 Docketed at Montgomery County Prothonotary on 05/31/2016 3:43 PM, Fee = $0.00

<u>Exhibit A (Updated January 2014) Viropharma – Daedalus Biotech Advisors</u>

1.     Dyax  --  Original Finder's Fee Contract (3/13/2007)

2.     Metabasis  --  Original Finder's Fee Contract (3/13/2007)

3.     Haptogen  --  Original Finder's Fee Contract (3/13/2007)

4.     Xenoport  --  Original Finder's Fee Contract (3/13/2007)

5.     Enanta  --  6/25/07

6.     Dynogen  --  6/25/07

7.     Y's Therapeutics  --  6/25/07

8.     Osiris  --  6/25/07

9.     Midway Pharmaceuticals  --  6/25/07

10.    Nabriva Therapeutics  --  6/25/07

11.    Taigen Biotechnology  --  6/25/07

12.    LifeCycle Pharma A/S  --  6/26/07

13.    Acambis  --  6/26/07

14.    Cangene  --  9/12/07

15.    Pacgen  --  9/12/07

16.    Sucampo  --  9/12/07

17.    Tanabe Seiyaku  --  9/12/07

18.    NanoBio  --  9/12/07

19.    Toyoma Chemical  --  9/12/07

20.    Trius  --  9/12/07

Case# 2016-04721-4 Docketed at Montgomery County Prothonotary on 05/31/2016 3:43 PM, Fee = $0.00

21.    AGI Therapeutics  --  9/12/07

22.    Pharming NV  --  9/12/07

23.    Pipex  --  9/12/07

24.    Kenta Biotech  --  9/12/07

25.    Geistlich Pharma AG  --  9/12/07

26.    Henogen SA  --  9/12/07

27.    Cellerix  --  9/12/07

28.    Kiadis  --  9/12/07

29.    Cosmo Pharmaceuticals  --  9/12/07

30.    Rigel Pharmaceuticals  --  6/23/08

31.    Ariad  --  6/23/08

32.    Chelsea Therapeutics  --  8/28/08

33.    Cortex  --  10/07/08

34.    Archemix  --  5/10/09

35.    Incyte  --  5/11/09

36.    Jazz Pharmaceuticals  --  6/28/09

37.    Avanir Pharmaceuticals  --  6/29/09

38.    Amicus Therapeutics  --  7/17/09

39.    FOLDRx  --  10/15/09

40.    Keryx  --  11/09/09

41.    Aeterna Zentaris  --  11/09/09

42.    Alkermes (Vivitrol)  --  9/07/10

Case# 2016-04721-4 Docketed at Montgomery County Prothonotary on 05/31/2016 3:43 PM, Fee = $0.00

43.    Aerovance -- 9/07/10

44.    Anacor Pharmaceuticals -- 09/07/10

44.    QuatRx -- 9/07/10

45.    Tranzyme Pharma -- 9/07/10

46.    Trubion Pharmaceuticals -- 9/07/10

47.    Ironwood -- 9/07/10

48.    Relypsa -- 9/07/10

49.    KaloBios -- 9/07/10

50.    Proteon Therapeutics -- 9/07/10

51.    YM Biosciences -- 10/10/10

52.    Carbaglu (Recordati/Orphan Europe) -- 1/23/11

53.    Acadia Pharmaceuticals -- 4/06/11

54.    Acceleron Pharma -- 4/20/11

55.    Ocera -- 4/20/11

56.    Celsion -- 4/24/11

57.    Prana Biotechnology -- 5/01/11

58.    Ikaria Holdings (terlipressin) -- 5/13/11

59.    BioAlliance Pharma -- 5/14/11

60.    Ferring (terlipressin) -- 6/25/11

61.    Sinclair IS Pharma -- 6/23/11

62.    Titan Pharmaceuticals -- 7/11/11

3

20

Case# 2016-04721-4 Docketed at Montgomery County Prothonotary on 05/31/2016 3:43 PM, Fee = $0.00

63.   Neuran Pharmaceuticals -- 9/06/11

64.   Edison Pharmaceuticals -- 9/21/11

65.   Pfizer/King divestiture products -- 10/02/10

a)   Cyanokit Auto-Injector 5g (hydroxocobalamin for injection) -- Cyanide Poisoning

b)   DuoDote Auto-Injector (atropine & pralidoxime chloride) -- Nerve Agent Exposure.  Meridian has recently received an order from the US Government for an order for DuoDote in excess of $100 million.

c)   Thrombin JMI (bovine-derived hemostat)

d)   Thrombi-Gel (thrombin/gelatin foam hemostat) - Gel for moderately to severely bleeding wounds.

e)   Thrombi-Pad (3x3 hemostatic pad) - Sterile trauma dressing for moderately to severely bleeding wounds.

66.   SigmaPharma -- 10/26/11

67.   Marinus -- 1/11/12

68.   Biocryst -- 3/21/08


These are the firms that should be listed presently on Exhibit A of the Viropharma – Daedalus Biotech Advisors contract.


Although a number of these firms have been taken over, I have retained them on the list in the (unlikely) event of a spinout making them once more a possible acquisition or partnership target.


--------------------------------------------------------------------------------

69.   (11/17/12) Dexamethasone -- Rett Syndrome -- Clinical work at Johns Hopkins.  Repositioned Compound.  **Compound added in error**.  **Remove**.

70.     Mecasermin -- Rett Syndrome -- Childrens Hospital of Boston. Repositioned Compound -- 11/17/12.

71.     (Corrected 12/03/12) Dextromethorphan -- Rett Syndrome -- Clinical work at Johns Hopkins.  Repositioned Compound.  Replaces Dexamethasone in Rett Syndrome.

72.     Levodopa -- Angelman Syndrome.  Repositioned Compound -- 12/04/12.

73.     Psyadon -- 2/19/13

74.     Amicus (duplicate) -- 7/17/09

75.     Neurophyxia BV -- 2/17/13

76.     Cornerstone Therapeutics -- 2/18/13

77.     Zymenex -- 1/13/13

78.     University of Pennsylvania (Orphan Disease Research Center); University
of      Pennsylvania Medical Center.  1/23/13

79.     University of Rochester (Batten's disease - Dr.Mink) -- 5/23/13

81.     University of Michigan (Dr. Xu) -- 9/26/13

82.     Callidus Pharma (Most assets acquired by Amicus; remaining assets available) -- 10/1/13

83.     Edimer  Pharmaceuticals -- 2/9/13

84.     Oxyrane -- 3/16/13

85.     Minoryx Therapies -- 10/15/13

86.     Oxygen Therapeutics Inc -- 2/17/13

87.     Dr. Dickson's MPS lab at UCLA -- 4/25/13

88.     Ultragenyx -- 6/15/13

89.     Catalyst Pharma  -- 10/7/2011

Case# 2016-04721-4 Docketed at Montgomery County Prothonotary on 05/31/2016 3:43 PM, Fee = $0.00

Case# 2016-04721-4 Docketed at Montgomery County Prothonotary on 05/31/2016 3:43 PM, Fee = $0.00

90.    Intermune --- 3/27/13

Case# 2016-04721-4 Docketed at Montgomery County Prothonotary on 05/31/2016 3:43 PM, Fee = $0.00

# EXHIBIT 3

Case# 2016-04721-4 Docketed at Montgomery County Prothonotary on 05/31/2016 3:43 PM, Fee = $0.00

<u>Dyax</u>  (6/21/2006)

Dyax Corporation:  Public Company (DYAX).  Incorporated as Biotage, Inc. in 1989.  Initial public offering (IPO) in August 2000 raised $69 million.

Location:  300 Technology Square, Cambridge, Massachusetts  02139.

Telephone:  (617) 225-2500; Fax:  (617) 225-2501.

Website:  www.dyax.com.

CEO:  Henry Blair (co-founder).

Director, Corporate Development:  Mark deSouza, Ph.D.  Telephone:  (617) 225-5726:  Fax:  (617) 225-2501.

Closing Market Price (5/31/06):  $2.94.

Shares Outstanding:  39.1 million shares.

**Market Value:  $115 million**.

**Net Present Value (see last page):  $680 million**

<u>Summary</u>

  Dyax is a research-based biotech company with strong senior management, an advanced and highly valuable Phage Display platform technology, and a compound (DX-88) with multiple important indications.  We believe Dyax meets the criteria for the acquisition Viropharma is seeking, particularly at its current deeply depressed share price.

<u>Assets</u>

I.  Pivotal-Stage Compound **DX-88**.  A small protein developed using Dyax' Phage Display platform technology.

Mechanism of Action:  Kallikrein inhibition.

DX-88 is in development for two principal indications:

Case# 2016-04721-4 Docketed at Montgomery County Prothonotary on 05/31/2016 3:43 PM, Fee = $0.00

1) **Hereditary Angioedema** (HAE) is a congenital, debilitating and potentially fatal rare inflammatory disease with acute attacks. Partnered with Genzyme.

Dyax recently announced that the Phase II EDEMA2 trial showed solid top-line data with a 30mg subcutaneous dose. Early clinical results suggest that because of its relatively short half-life of 2.5 hours, the acute indication offers the fastest path into the HAE market.

The same 30mg subcutaneous dose is being used in the Phase III EDEMA3 trial in acute HAE attacks, which dosed its first patient in December 2005. This pivotal trial is anticipated to be completed by Q3 or Q4 of 2006.

DX-88 was awarded an orphan indication by the FDA on February 4, 2003 for the treatment of Hereditary Angioedema.

On May 15 of this year, Dyax announced a change in the regulatory pathway for DX-88 in HAE. Oversight of the program has been moved from the Center for Biologics Evaluation and Research (CBER) division of the FDA to the Center for Evaluation and Research Division (CDER). In a meetings with CDER following this reassignment the FDA has stated that Dyax will need to complete some "incremental clinical work," particularly a dose-ranging study for final approval in HAE.

*While this will likely delay approval of DX-88, perhaps by as much as a year, the sharp decline in stock price of up to 40% presents Viropharma with an extraordinary opportunity to acquire Dyax at a price significantly below its real value.*

2) Blood loss and inflammation during **Coronary Artery and Bypass Graft Surgery** (CABG). (Not Partnered)

A Phase I/II trial demonstrated that patients treated with DX-88 in CABG required 50% less transfused blood during surgery than patients receiving placebo.

Development is temporarily halted while Dyax seeks a partner in this indication.

II.    **Non-exclusive, Partner-funded Collaborations**: 1) Up-front fees collected from companies that wish to gain access to its Phage Display Technology to generate drug candidates. 2) Percentage of sales generated by compounds developed using this technology.

Case# 2016-04721-4 Docketed at Montgomery County Prothonotary on 05/31/2016 3:43 PM, Fee = $0.00

III.     Remaining Pipeline: There are 12 preclinical stage drug candidates including DX-2240, which is targeted at angiogenesis, in addition to whatever future compounds are developed using Dyax' in-house technology.

IV.     Debiopharm S.A. is developing a second Dyax clinical-stage compound, DX-890, for pulmonary disorders.  It is a recombinant inhibitor of human neutrophil elastase.  Debiopharm has exclusive worldwide rights to the development and use of this compound in Cystic Fibrosis and Acute Respiratory Distress Syndrome (ARDS), with Dyax receiving milestones and royalties in these indications.  Dyax retains rights to all other indications.

DX-890 was granted orphan status in 2003 for Cystic Fibrosis in the United States and in the European Community.

DX-88 Indications & Competition

1) Hereditary Angioedema (HAE):  A congenital, potentially fatal rare inflammatory disorder caused by a mutation in the SERPING1 gene improperly encoding the C1 inhibitor.  The result is serious recurrent subcutaneous swellings, the most dangerous of which are those in the larynx which are often fatal.

There is no approved therapy in the United States for HAE, although steroids are widely used off-label.  Competing therapies are in clinical development for both prophylactic and acute administration.

2) Coronary Artery and Bypass Graft Surgeries (CABG).  Serious cardiovascular procedures with an age-dependent risk of diminished post-surgical mental function and other serious adverse effects because of excessive blood loss.

The only approved drug in CABG in *Trasylol* (Aprotinin), with its use severely limited because of a serious adverse effect profile.

HAE Market Size

There are an estimated 7,000 to 10,000 HAE sufferers in the United States, of which around 20% are considered severe – because of the number of laryngeal attacks and the total monthly incidents.  There is a similar or slightly higher number in Europe.

Case# 2016-04721-4 Docketed at Montgomery County Prothonotary on 05/31/2016 3:43 PM, Fee = $0.00

We believe the price of a prophylactic therapy in the HAE market can be expected to approach what is paid for other severe orphan disease prophylactic therapies such as Genzyme's *Cerezyme* for Gaucher Disease and *Fabrazyme* for Fabry Disease.

In the acute market there is less adequate precedent, but given the average number of attacks experienced by patients with severe disease is around 1.7 per month and with a yearly $200,000 prophylaxis price tag, we can figure around $8,000 to $10,000 per emergency room administration. Estimating total revenue per patient is harder. With 20% of the mean estimate of 8,500 patients having the most severe disease (1,700), each averaging 1.7 attacks per month necessitating emergency room treatment, and a $9,000 drug cost per attack, we arrive at a rough estimate of a total annual cost of $183,600 per severe patient.

This suggests annual peak sales potential in the United States of $312 million for the most severe patients. The remaining, less severely ill 80% of the patients account for an estimated additional 33% of acute attacks for an approximate total HAE market of $415 million. As the first agent to reach the market, and with the ease of subcutaneous administration, we expect DX-88 to gain 80% of the total HAE market for revenue of $332 million. Dyax' 50/50 profit split with Genzyme, and an anticipated profit margin of around 88% will provide the firm $146 million in pre-tax profit.

The transfer of oversight for CBER to CDER and the attendant delay in the approval timeline of perhaps a year may allow a prophylactic therapy (C1, Lev) to beat DX-88 to market allowing it time to make serious inroads, especially with the most seriously ill patients. This could cut peak annual sales of DX-88 by as much as 50%, leaving Dyax' share of HAE profit at a peak of $73 million. However like Genzyme, we believe the FDA is likely to prefer the DX-88's subcutaneous dosing to the iv administration of C1 for at-home use.

If the HAE market does turn out to be as large or larger than we think, and DX-88 cannot be extended beyond the acute indication because of its relatively short half-life, Dyax may wish to develop DX-88 in a longer-acting formulation (pegylation?) or use its excellent in-house capabilities to develop a new therapy to pair with or succeed DX-88.

Genzyme Partnership

Dyax and Genzyme are partnered in the DX-88 Hereditary Angioedema (HAE) indication. They are sharing development costs going forward, while Dyax is to receive milestone payments from Genzyme. Genzyme will be responsible for marketing in HAE and other inflammatory disorders, while Dyax retains CABG

4

28

Case# 2016-04721-4 Docketed at Montgomery County Prothonotary on 05/31/2016 3:43 PM, Fee = $0.00

and all other indications. Dyax and Genzyme will split the profits 50-50. Genzyme has demonstrated its excellence in developing and marketing orphan disease therapies, and their participation in the program is strong positive.

Genzyme has recently reiterated its support for the DX-88 collaboration.

## CABG Market Size

There are approximately 500,000 CABG procedures yearly in the United States, and around 1,250,000 worldwide. Dyax presently owns 100% of this indication, but is seeking a large partner with expertise in the cardiovascular field to handle commercialization and the large and expensive pivotal trials that are necessary in the CV field.

Should DX-88 continue to show the impressive efficacy that was seen in Phase I/II, with its clean adverse reaction profile, we should expect at least a 50% margin over the $1,000 cost of *Trasylol*.

Those most at risk from intra-operative and immediate post-operative bleeding are in the 50 years and above age group, accounting for 73% of all patients. 500,000 procedures per year imply a total of 365,000 patients in the higher risk group. A 50% penetration of this market in the U.S. at a cost of $1,500 per dose suggests peak annual sales of around $274 million dollars. A mean royalty of 17.5%, would yield Dyax approximately $48 million at peak annual pre-tax profit. Worldwide sales might conservatively equal at least half those in the United States. An international royalty of 10% should gain around $14 million for a worldwide bottom line to Dyax of $62 million.

## Phage Display Technology

While the hardest to value, we believe this asset may turn out to be the **"jewel in the crown"** for Dyax. Phage Display is a cutting edge technology in the description, cataloging, and generation of therapeutic proteins.

To date Dyax has signed more than 75 collaborations that have not only been a source of current income, but hold the promise of a large unfunded future income stream as the resulting compounds make their way through clinical trials and onto the market. With such high quality partners as Amgen, Biogen Idec, Merck, DuPont, and Bristol-Myers Squibb it is not unreasonable to expect that

Case# 2016-04721-4 Docketed at Montgomery County Prothonotary on 05/31/2016 3:43 PM, Fee = $0.00

there may be a time when the revenue from these collaborative programs exceeds those therapies developed and owned by Dyax itself.

Proposition

**The recent decline in stock price and market value over the past month from $180 to $115 million presents an extraordinary opportunity for Viropharma, particularly when compared to Dyax' net present value of $680 -- as calculated below.**

While DX-88's entry into the HAE market may be delayed by up to a year, and while the approval of a C1 inhibitor for HAE may diminish the market for acute use of DX-88 in emergency rooms and ultimately at home, the value of Dyax has as much or more to do with the company's other assets – particularly its Phage Display collaborations.

A Phase II partnership sometime in the coming year for DX-88 in CABG should see Dyax with an upfront cash payment, milestones, and a royalty rate of between 15% - 20%.  DX-890 at Debiopharm is being repositioned in ARDS.

There are additional opportunities for the preclinical molecules in Dyax' own pipeline.  And we expect that pipeline to be enriched by additional products of Dyax' own technology platform.

It is our belief that Dyax' Phage Display Technology is the firm's most valuable asset.  The products of collaborations signed with such high quality companies as Amgen, Biogen-Idec, Merck and more than 70 others should generate an ever-increasing revenue stream as these drugs reach the market.

Present Value:

DX-88  HAE ($146 mm peak profit/25% discount[1]):  $62 mm (x 6) = $372 million

DX-88  CABG ($62 mm peak profit/35% discount[2]):  $11 mm (x 8) = $88 million

Technology Value/Licensing Revenue:  $100 mm:  (x 1.5) = $150 million

---

[1]  3 years.
[2]  4 years.

Case# 2016-04721-4 Docketed at Montgomery County Prothonotary on 05/31/2016 3:43 PM, Fee = $0.00

Pipeline (including Debiopharm):  $10 mm (x 3) = $30 million

Net Cash Balance (6/2006):  $40 (x 1) = $40 million

Total Present Value (6/2006) = $680 million

Total Present Value (without cash & cash equivalents) = $640 million.


A $200 million offer for Dyax would represent a 73% premium over the current $115 million market value.  Subtracting the $40 million net cash balance held by Dyax reduces the out-of-pocket acquisition cost to $160 million.  **Viropharma has the opportunity to acquire Dyax at its current depressed market price for 25% of its true value.**

Additionally, despite the timeline setback of DX-88 in Hereditary Angioedema the deal could be accretive by Q4, 2008.

Viropharma would be well-advised to use its increasing cash flow from the growing Vancocin earnings and its concomitant increased borrowing power to take advantage of this opportunity to acquire Dyax cheaply.  Because we feel Vancocin will continue to drive Viropharma's stock higher, we do not recommend an equity offer for the firm.  It should be an all-cash deal, using Viropharma's enhanced borrowing power to raise necessary funds.

The partnership with Genzyme is a significant bonus, and means that a limited amount of cash will need to be spent to bring DX-88 to the HAE market.  The same can be said for DX-88 in CABG with a partner likely this year.  And the asset with the greatest potential, Dyax' Phage Display Technology, should generate increasing earnings for years to come.  It should also provide a stream of drug candidates in the indications of most interest to Viropharma.

Case# 2016-04721-4 Docketed at Montgomery County Prothonotary on 05/31/2016 3:43 PM, Fee = $0.00

# EXHIBIT 4

Case# 2016-04721-4 Docketed at Montgomery County Prothonotary on 05/31/2016 3:43 PM, Fee = $0.00

CONSULTING AGREEMENT

ViroPharma Incorporated, with a place of business at 730 Stockton Drive, Exton, PA 19341 ("ViroPharma") and Daedalus Biotech Advisors with a place of business in Elkins Park, PA ("Consultant") agree to all of the terms and conditions of this Consulting Agreement ("Agreement") dated November 29, 2012.

1.     Services.

(a)     The Company and Consultant are parties to a separate agreement (the "Finder's Fee Agreement") under which Consultant has identified and will identify in the future certain opportunities for the Company as defined by the Company from time to time (the "Business Development Opportunities"). In addition to the services to be provided under the Finder's Fee Agreement, Consultant shall provide the following "Services" as directed by ViroPharma: preparation of reports and research related to Business Development Opportunities. Consultant is not being engaged by the Company for assistance in valuation of potential Business Development Opportunities, in negotiating transaction or in advising the Company on how to structure any transaction from a financial point of view.  If requested by the Company, Consultant may offer its opinion on some of those issues, but the Company is not retaining it for that purpose.

(b)     The specific details of each assignment in respect of the Services will be separately negotiated and contracted for in writing, shall be set forth in a work order including the maximum number of hours and maximum fee for such services and shall be subject to all of the terms and conditions set forth in this Agreement (each, a "Work Order"), which is incorporated herein by reference. To the extent that any of the provisions of a Work Order are inconsistent with the provisions of this Agreement, the provisions of this Agreement shall control.

2.     Compensation & Expenses.  ViroPharma shall pay Consultant $ 300 per hour. ViroPharma shall not be obligated to pay Consultant more than $ 50,000 for the Services without the prior written consent of ViroPharma.  Each month, Consultant shall invoice ViroPharma detailing:  a) all time Consultant spent performing the Services in the immediately preceding month; b) Consultant's pre-approved, reasonable travel expenses incurred in accordance with ViroPharma's Corporate Travel Policy for Outside Contractors with itemized documentation and receipts; c) the total amount due; and d) other information and details as ViroPharma reasonably requests.

Invoices shall be sent to:

Via Email:     vpaccounting@viropharma.com
               *Attention:* ACCOUNTS PAYABLE – Clayton Fletcher

ViroPharma shall pay Consultant any amounts due that are not reasonably disputed by ViroPharma by check to Consultant's address above within thirty days after receiving the invoice. Fees and expenses paid under this Agreement are separate from any fees and expenses payable under the Finder's Fee Agreement, provided that, in no event shall Consultant be reimbursed twice for the expenses.

Page 1 of 5
Contract #

33

Case# 2016-04721-4 Docketed at Montgomery County Prothonotary on 05/31/2016 3:43 PM, Fee = $0.00

3.   **Term of Agreement**.  This Agreement shall begin on the date first written above and shall continue until the later of November 30, 2013 or the completion of the Services, unless terminated earlier by either party in writing.  Notice of termination of the Finder's Fee Agreement shall be considered as notice of termination of this Agreement.

4.   **Confidential Information**.

(a)   "Confidential Information" means any information, materials or methods in whatever form or embodiment that has not been made available by ViroPharma to the general public and any information, materials or methods materially developed therefrom, except that Confidential Information shall not include any information, material or method that:

(i)   at the time of disclosure is in, or after disclosure becomes part of the public domain, through no improper act on the part of Consultant or any of its employees;

(ii)   was in Consultant's possession at the time of disclosure, as shown by written evidence, and was not acquired, directly or indirectly, from ViroPharma;

(iii)   Consultant receives from a third party, _provided that_ such Confidential Information was not obtained by such third party, directly or indirectly, from ViroPharma; or

(iv)   is independently developed by Consultant without reference to Confidential Information.

Specific information disclosed as part of the Confidential Information shall not be deemed to be in the public domain or in the prior possession of Consultant merely because it is embraced by more general information in the public domain or in the prior possession of the Consultant. Failure to mark any of the Confidential Information as confidential or proprietary shall not affect its status as Confidential Information under the terms of this Agreement.

(b)   Consultant shall keep all Confidential Information confidential, and Consultant shall not disclose, disseminate, publish, reproduce or use Confidential Information except to perform the Services. Consultant shall, at a minimum, take those precautions with respect to the Confidential Information that Consultant uses to protect Consultant's own confidential information.  If Consultant is required by judicial or administrative process to disclose Confidential Information, Consultant shall promptly notify ViroPharma to allow ViroPharma a reasonable time to oppose such process.  Any breach of this Section 4 by an employee or agent of Consultant shall be deemed to be a breach by Consultant.

(c)   On ViroPharma's request, or upon the termination or expiration of this Agreement, Consultant shall immediately: (i) stop using Confidential Information; (ii) return all materials provided by ViroPharma to Consultant that contain Confidential Information, except for one copy that may be retained by Consultant's legal counsel to confirm compliance with the obligations under this Agreement; (iii) destroy all copies of Confidential Information in any form including Confidential Information contained in computer memory or data storage apparatus or materials prepared by or for Consultant; and (iv) provide a written warranty to ViroPharma that Consultant has taken all the actions described in the foregoing Subparagraphs 4(c)(i-iii).

Page 2 of 5
Contract #

Case# 2016-04721-4 Docketed at Montgomery County Prothonotary on 05/31/2016 3:43 PM, Fee = $0.00

5.     Property.  Consultant may remove materials containing Confidential Information from ViroPharma's premises only for as long as necessary to perform the Services and Consultant shall return all such materials and all copies thereof promptly, but in any event no later than the date of termination or expiration of this Agreement.

6.     Intellectual Property.  ViroPharma shall be the sole and exclusive owner of any and all writings, documents, works made for hire, inventions, discoveries, know-how, processes, chemical entities, compounds, plans, memoranda, tests, research, designs, specifications, models and data that Consultant makes, conceives, discovers or develops, either solely or jointly with any other person in performance of the Services (collectively, "Work Product").  Consultant shall promptly disclose to ViroPharma all information relating to Work Product.  Consultant acknowledges that all of the Work Product that is copyrightable shall be considered a work made for hire under United States Copyright Law.  To the extent that any copyrightable Work Product may not be considered a work made for hire under Copyright Law or to the extent that, notwithstanding the foregoing provisions, Consultant may retain an interest in any Work Product that is not copyrightable, Consultant hereby irrevocably assigns and transfers to ViroPharma, and to the extent that an executory assignment is not enforceable, Consultant hereby agrees to assign and transfer to ViroPharma, in writing, from time to time, upon request, any and all right, title, or interest that Consultant has or may obtain in any Work Product without the necessity of further consideration.  ViroPharma shall be entitled to obtain and hold in its own name all copyrights, patents, trade secrets and trademarks with respect thereto.  At ViroPharma's request and expense, Consultant shall assist ViroPharma in acquiring and maintaining its right in and title to, any Work Product.  Such assistance may include, but will not be limited to, signing applications and other documents, cooperating in legal proceedings, and taking any other steps considered necessary or desirable by ViroPharma.

7.     Restrictive Covenants.  During the term of this Agreement and for two (2) years thereafter, Consultant shall not:

   (a)     interfere with any formal or informal business or other relationship between ViroPharma and any third party;

   (b)     contact any of ViroPharma's then current personnel, whether employees or independent contractors to offer such personnel employment, except that this prohibition shall not prevent any of such personnel (whether employees or independent contractors) from initiating contact with Consultant for the purpose of obtaining employment.

Company agrees that that Consultant's provision of services similar to those described herein or in the Finder's Fee Agreement for third parties shall not constitute a breach of this Section 7.

8.     Representations.  Consultant represents that Consultant is not subject to any other agreement that Consultant will violate by signing this Agreement.

9.     Debarment.  Consultant represents that Consultant has not been debarred under the provisions of the Generic Drug Enforcement Act of 1992, including without limitation, 21 U.S.C. Section 335a. If, at any time during the term of this Agreement, Consultant (a) becomes debarred, or (b) receives notice of action or threat of action with respect to its debarment,

Page 3 of 5
Contract #

35

Consultant shall notify ViroPharma immediately. If Consultant becomes debarred, this Agreement shall terminate automatically without any further action or notice by ViroPharma. If Consultant receives notice as set forth in clause (b) above, ViroPharma shall have the right to terminate this Agreement immediately.

10.    Miscellaneous.

(a)    Consultant is an independent contractor. Nothing contained in this Agreement shall create or imply the creation of a partnership or employment relationship between ViroPharma and Consultant. Neither party shall have any authority to bind the other. ViroPharma shall not deduct or withhold from any monies payable to Consultant hereunder any amount for any tax or employee benefit.

(b)    This Agreement shall be construed and enforced in accordance with the laws of the Commonwealth of Pennsylvania, without regard to the conflict of law principles of Pennsylvania or any other jurisdiction. Any legal proceeding relating to this Agreement shall, at ViroPharma's option, be instituted exclusively in the United States District Court for the Eastern District of Pennsylvania or in any court of general jurisdiction in Chester County, Pennsylvania, and Consultant hereby consents to the personal and exclusive jurisdiction of such court and hereby waives any objection that Consultant may have to the laying of venue of any such proceeding and any claim or defense of inconvenient forum.

(c)    If any provision of this Agreement is determined to be void, invalid, unenforceable or illegal for any reason, the validity and enforceability of all of the remaining provisions hereof shall not be affected thereby.

(d)    The parties acknowledge that it is impossible to measure fully, in money, the injury that will be caused in the event of a breach or threatened breach of Sections 4, 5 or 6 of this Agreement, and Consultant waives and shall not assert the claim or defense that ViroPharma has an adequate remedy at law. ViroPharma's receipt of injunctive relief to enforce the provisions of this Agreement shall not prevent ViroPharma from seeking or obtaining any other remedy it may have at law or in equity, and the prevailing party in any such litigation shall be entitled to recover all reasonable expenses of litigation, including reasonable attorney fees.

(e)    This Agreement contains the entire agreement and understanding of the parties relating to the subject matter hereof and merges and supersedes all prior discussions, agreements and understandings of every nature between them relating to the subject matter hereof. This Agreement may not be amended except by written agreement signed by both of the parties hereto. The waiver of the breach of any term or provision of this Agreement shall not be a waiver of any other or subsequent breach of this Agreement. This Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original and when taken together shall constitute the same Agreement. The obligations of Consultant as set forth herein, other than Consultant's obligations to perform the Services, shall survive the termination of Consultant's engagement. ViroPharma may assign this Agreement to, and this Agreement shall bind and inure to the benefit of, any assignee of ViroPharma. This Agreement shall not be assignable by Consultant without the written consent of ViroPharma.

Case# 2016-04721-4 Docketed at Montgomery County Prothonotary on 05/31/2016 3:43 PM, Fee = $0.00

Case# 2016-04721-4 Docketed at Montgomery County Prothonotary on 05/31/2016 3:43 PM, Fee = $0.00

IN WITNESS WHEREOF, the parties have caused this Consulting Agreement to be executed the day and year first written above.

VIROPHARMA INCORPORATED              DAEDALUS BIOTECH ADVISORS

By: _____       By: _____

Name: _____       Name: _BRUCE G. O'BRIEN_____

Title: _____      Title: _PRESIDENT_____

                                     Federal Tax ID #

                                     REDACTED

                                                    Page 5 of 5
                                                    Contract #

                                                              37

Case# 2016-04721-4 Docketed at Montgomery County Prothonotary on 05/31/2016 3:43 PM, Fee = $0.00

AMENDMENT 1
TO
CONSULTING AGREEMENT

This First AMENDMENT TO CONSULTING AGREEMENT (the "Amendment") is entered into effective as of January 1, 2013, by and between ViroPharma Incorporated ("ViroPharma") and Daedalus Biotech Advisors, (the "Consultant").

WHEREAS, ViroPharma and Consultant are parties to that certain Consulting Agreement dated November 29, 2012 (the "Agreement").

WHEREAS, the parties wish to amend the Agreement, as set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained in the Amendment, and intending to be legally bound, the parties agree as follows:

A.  Amendment of Section 2.   Section 2 is hereby amended and restated in its entirety to read as follows:

Compensation & Expenses. ViroPharma shall pay Consultant $350.00 per hour. ViroPharma shall not be obligated to pay Consultant more than $50,000.00 for Services without prior written consent of ViroPharma. Each month, Consultant shall invoice ViroPharma detailing: a) all time Consultant spent performing the Services in the immediately preceding month; b) Consultant's pre-approved, reasonable travel expenses incurred in accordance with ViroPharma's Corporate Travel Policy for Outside Contractors with itemized documentation and receipts; c) the total amount due; and d) other information and details as ViroPharma reasonably requests.

Invoices shall be sent to:

**Via Email:**  vpaccounting@viropharma.com
*Attention:*  **ACCOUNTS PAYABLE – Clayton Fletcher**

B.  The Agreement shall remain in full force and effect, subject only to the express changes set forth in the Amendment, and the parties hereto hereby ratify and confirm the provision of the Agreement, as so modified. The Agreement, as supplemented and modified by this Amendment, constitutes the entire understanding among the parties with respect to the subject matter thereof, and supersedes any prior understanding and/or written or oral agreements among them. This Amendment may not be changed, modified discharged or terminated orally or in any manner other than by an agreement in writing signed by the parties hereto. All references to "this Agreement" in the Agreement shall mean the Agreement as modified hereby and from time to time hereafter. This Amendment may be executed in, and will be governed as to validity, interpretation and effect by the laws of the Commonwealth of Pennsylvania, without regard to principles of conflict of laws.

Page 1 of 2
Contract #11256 (Amend 1 to 10472)

38

Case# 2016-04721-4 Docketed at Montgomery County Prothonotary on 05/31/2016 3:43 PM, Fee = $0.00

CONSULTING AGREEMENT
AMENDMENT 3

This Third AMENDMENT TO CONSULTING AGREEMENT (the "Amendment") is entered into as of August 30, 2013 by and between ViroPharma Incorporated ("ViroPharma") and Daedalus Biotech Advisors (the "Consultant").

WHEREAS, ViroPharma and Consultant are parties to that certain Consulting Agreement dated November 29, 2012 as amended and restated (the "Agreement").

WHEREAS, the parties wish to amend the Agreement, as set forth herein,

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained in the Amendment, and intending to be legally bound, the parties agree as follows:

A.  _Amendment of Section 2 Compensation & Expenses._   Section 2 is hereby amended by deleting "$100,000 " and replacing it with "150,000 ".

B.  _Amendment of Section 3 Term of Agreement._   Section 3 is hereby amended by deleting "November 30, 2013" and replacing it with "May 31, 2014".

C.  The Agreement shall remain in full force and effect, subject only to the express changes set forth in the Amendment, and the parties hereto hereby ratify and confirm the provision of the Agreement, as so modified. The Agreement, as supplemented and modified by this Amendment, constitutes the entire understanding among the parties with respect to the subject matter thereof, and supersedes any prior understanding and/or written or oral agreements among them. This Amendment may not be changed, modified discharged or terminated orally or in any manner other than by an agreement in writing signed by the parties hereto. All references to "this Agreement" in the Agreement shall mean the Agreement as modified hereby and from time to time hereafter. This Amendment may be executed in, and will be governed as to validity, interpretation and effect by the laws of the Commonwealth of Pennsylvania, without regard to principles of conflict of laws.

IN WITNESS WHEREOF, the parties have executed this Amendment as of this day and year first above written.

VIROPHARMA INCORPORATED

By: _____

Name: _____
Daniel B. Soland
Vice President
Title: _____
Chief Operating Officer

Daedalus Biotech Advisors

By: _____

Name: BRUCE G. BRACKEN

Title: PRESIDENT

Page 1 of 1

Amendment-Short Form_20121138

Contract # 14317-DAED-CONA-201308

39