**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| BRUCE G. O'BRIEN d/b/a DAEDALUS BIOTECH ADVISORS , | |
| Plaintiff, | No. 16-CV-03184 (PBT) |
| v. | |
| SHIRE PLC, SHIRE PHARMACEUTICAL HOLDINGS IRELAND LIMITED, SHIRE PHARMACEUTICALS INTERNATIONAL and SHIRE VIROPHARMA INCORPORATED | Chief Judge Petrese B. Tucker |
| Defendants. | |

**AMENDED COMPLAINT**

Plaintiff, Bruce G. O'Brien d/b/a Daedalus Biotech Advisors, by and through his

undersigned counsel, brings this action against defendants Shire plc, Shire Pharmaceutical

Holdings Ireland Limited, Shire Pharmaceuticals International, and Shire ViroPharma

Incorporated (unless identified individually, collectively, "Shire" or "defendants").  Mr. O'Brien

requests that this Court enter judgment in his favor and against defendants.  In support thereof,

Mr. O'Brien avers as follows:

**INTRODUCTION AND NATURE OF THE ACTION**

1.   Mr. O'Brien entered into an agreement with defendant Shire ViroPharma

Incorporated (formerly known as Viropharma Incorporated), whereby Mr. O'Brien would

provide certain services to assist Shire ViroPharma in making certain acquisitions.

2.   In exchange for the services that Mr. O'Brien provided under that agreement, which

restricted Mr. O'Brien's ability to perform those services on behalf of any other party, Shire

ViroPharma Incorporated agreed to pay to Mr. O'Brien one percent of the consideration paid for

any acquisition identified and preliminarily analyzed by Mr. O'Brien, and included on Exhibit A to the Finder's Fee Agreement, as defined below.

3.   For years Mr. O'Brien faithfully provided Shire ViroPharma Incorporated, and later defendants, with information and introductory analysis pursuant to their contract, and refrained from employing his expertise in the service of any other biopharmaceutical company that sought to make the acquisitions identified by Mr. O'Brien and subsequently listed on Exhibit A.

4.   In early 2016, following repeated suggestions made over the course of a decade by Mr. O'Brien, defendants acquired Dyax Corp., a corporation identified and analyzed by Mr. O'Brien, in a transaction covered by the agreement between Mr. O'Brien and defendants.

5.   To date, despite his requests, defendants have failed to make payment to Mr. O'Brien for the amount due under their contract.

6.   The refusal by defendants to pay Mr. O'Brien not only breaches the agreement between them, but also constitutes the unjust retention by defendants of a valuable benefit conferred upon them by Mr. O'Brien.

7.   Mr. O'Brien requests that this Court enter judgment in his favor and against defendants, jointly and severally, based upon the failure of defendants to satisfy their obligations under the valid contract between defendants and Mr. O'Brien.

## PARTIES AND VENUE

8.   Mr. O'Brien is an adult individual who does business as Daedalus Biotech Advisors ("Daedalus").

9.   Shire plc is a corporation incorporated in Jersey, with a principal place of business located at 5 Riverwalk, Citywest Business Campus, Dublin 24, Republic of Ireland D24 TW 13.

205144759.3

10.   On information and belief, Shire plc also has a principal place of business at 300 Shire Way, Lexington, MA 02421.

11.   Shire Pharmaceutical Holdings Ireland Limited is a corporation incorporated in the Republic of Ireland, with a principal place of business located at 5 Riverwalk, Citywest Business Campus, Dublin 24, Republic of Ireland D24 TW 13.

12.   Shire Pharmaceuticals International is a corporation incorporated in the Republic of Ireland with a principal place of business located at 5 Riverwalk, Citywest Business Campus, Dublin 24, Republic of Ireland D24 TW 13.

13.   By virtue of substantial managerial overlaps, common employees, use of common assets, and other common corporate relationships and various public representations, all for their mutual assistance, benefit and profit, that render Shire plc, Shire Pharmaceutical Holdings Ireland Limited,  Shire Pharmaceuticals International and Shire ViroPharma functionally one corporate entity and indistinguishable to third parties, this Court has both general and specific personal jurisdiction over each of those entities because (1) those entities have directed their activities, including but not limited to their research, development, manufacture, sales and/or advertising of products and services, at residents in the Commonwealth of Pennsylvania; (2) those contacts have been systematic and continuous; (3) the instant claims arise out of those activities and (4) the exercise of personal jurisdiction over each of those entities in the Commonwealth of Pennsylvania is reasonable and fair.

14.   On information and belief, Shire plc, Shire Pharmaceutical Holdings Ireland Limited, Shire Pharmaceuticals International and Shire ViroPharma share common employees, officers, directors and places of business, use common assets, and treat themselves and are treated by third parties as a single corporate entity.

15.    Shire ViroPharma Incorporated ("Shire ViroPharma") is a Delaware corporation with a principal place of business located at 730 Stockton Drive, Exton, Pennsylvania 19335. Shire ViroPharma is the new name for an entity previously known as ViroPharma Incorporated ("ViroPharma").

16.    Defendants are principals and agents of each other and jointly and severally liable to Mr. O'Brien.

17.    Daedalus was party to a Finder's Fee Agreement with ViroPharma, dated June 2007 (the "Original Agreement"), as well as a subsequent Amended and Restated Finder's Fee Agreement, dated November 30, 2012 (the "Finder's Fee Agreement").  True and correct copies of the Original Agreement and the Finder's Fee Agreement are attached hereto and incorporated herein as "Exhibit 1" and "Exhibit 2," respectively.

18.    The Finder's Fee Agreement is a contract between Mr. O'Brien and defendants.

19.    The parties formed the Original Agreement and the Finder's Fee Agreement, and Mr. O'Brien performed those agreements, in Montgomery County, in the Commonwealth of Pennsylvania.

20.    The causes of action asserted in this pleading accrued in Montgomery County, in the Commonwealth of Pennsylvania.

21.    Venue is proper in this Court pursuant to Pennsylvania Rule of Civil Procedure 2179.

## FACTUAL BACKGROUND

22.    Mr. O'Brien has been devoted to analyzing biotechnology companies – such as Dyax Corp. ("Dyax"), a Delaware corporation – for their investment potential, either as stock purchases or as potential acquisition targets, for many years.

4

**The Relationship Between Mr. O'Brien and ViroPharma And
The Resultant Finder's Fee Agreement**

23.     Mr. O'Brien originally contacted ViroPharma in the late 1990s about a potential investment, which never came to fruition.

24.     Following that initial contact, Mr. O'Brien remained in touch with employees of ViroPharma and eventually met with Michel de Rosen after Mr. de Rosen became CEO of ViroPharma.

25.     During their discussions in 2005 and 2006, Mr. de Rosen told Mr. O'Brien that ViroPharma was interested in licensing certain new drugs or drug candidates, and advised Mr. O'Brien of the areas in which ViroPharma had a particular interest.

26.     In 2006, Mr. O'Brien and ViroPharma continued their discussions, with a focus on one of the areas of interest identified by Mr. de Rosen – specifically, hospital-administered pharmaceuticals – on the basis that with its antibiotic, Vancocin, ViroPharma already had experience in marketing this class of drugs.

27.     In 2006, Mr. O'Brien suggested that ViroPharma acquire Dyax because: (1) Dyax's lead drug candidate (DX-88) was to be hospital-administered, a major criterion of Mr. de Rosen at the time;  (2) the principal target of DX-88, hereditary angioedema (HAE), was a serious, potentially fatal disease without adequate treatment approved in the United States;  (3) HAE was an "orphan disease" (i.e., a disease affecting fewer than 200,000 people in the United States), which would allow for generous pricing;  (4) DX-88 was also a potential therapy for a second hospital-based use:  coronary artery bypass graft surgery (CABG);  (5) in its Phage Display technology Dyax had an advanced platform technology with the potential to generate multiple advanced therapies either marketed directly by Dyax or licensed to other biopharmaceutical companies;  and (6) in what could become a lucrative stream of future revenues, Dyax had

5

already partnered with dozens of biopharma firms, licensing access to its Phage Display technology in exchange for milestone-based payments and royalties from multiple drug candidates in development by its partners.

28.   Mr. de Rosen told Mr. O'Brien that Mr. O'Brien would receive compensation for introducing ViroPharma to a company that ViroPharma ultimately acquired.

29.   That understanding and arrangement was ultimately reduced to writing in June 2007, when Mr. O'Brien and ViroPharma entered into the Original Agreement.

30.   An authorized representative of ViroPharma executed the Original Agreement.

31.   Both before and after the execution of the Original Agreement, Mr. O'Brien also introduced ViroPharma to other acquisition candidates.

32.   Pursuant to the Original Agreement, ViroPharma engaged Mr. O'Brien "to assist the Company [ViroPharma] in connection with a proposed acquisition of or other substantial transaction (a "Transaction") involving one or more pharmaceutical compounds or technologies ("Targets") or companies involved with one or more pharmaceutical compounds or technologies, including  any Target (a "Development Firm") each as identified on Exhibit A."  See Exhibit 1, p. 1.

33.   The Original Agreement required Mr. O'Brien to provide the following services to ViroPharma:

> A)  Disclose the name and purpose of the target or Development Firm to the Company in writing to the Company's Chief Executive Officer with a copy to the Company's Vice President of Business Development.  If Company, or any of its agents, has previously engaged in discussions with senior management of the Development Firm regarding a Transaction relating to that Target, Company will promptly, and in any event within five business days, so advise Daedalus and the parties shall not list such Target or Development Firm on Exhibit A.  If the Company does not so advise Daedalus, then the Target or Development Firm shall be added to Exhibit A; one party

6

will notify the other in writing (including by email) each time a Target or Development Firm is added to Exhibit A. No fee shall be payable by Company to Daedalus pursuant to this Agreement unless the Target and/or Development Firm are identified on Exhibit A.

B) Once a Target or Development Firm has been added to Exhibit A, deliver to the Company a written analysis of the therapeutic area, development/regulatory status, sales and marketing efforts, exclusivity proposition regarding the Target or Development Firm and an explanation why Daedalus believes Target or Development Firm would be a good candidate for a Transaction based upon the information in Daedalus' possession, provided however that Daedalus shall make reasonable efforts to consider information which is publicly available. If requested by the Company, this information would be presented in person to members of the Company's management at the Company's offices in Exton, PA.

C) When requested by the Company, contact the Development Firm by telephone and introduce the Company's CEO to senior management of the Development Firm. To the extent reasonably requested by the Company, Daedalus will attend up to three meetings of the Company's management for the purpose of evaluating the Target or Development Firm and any proposed Transaction and, if requested by the Company, will also attend meetings between the Company and the Development Firm.

See Exhibit 1, Section I ("Services to be Performed").

34. As compensation for the provision of these services, the Original Agreement provided as follows:

If: (a) the Company has not previously engaged in discussions with senior management of the Development Firm regarding a Transaction involving the Target or the Development Firm, and (b) a Transaction is during the Fee Period as defined below, Company shall pay Daedalus a fee in cash equal to one percent of the total consideration paid by the Company pursuant to Agreements entered into during the Fee Period in connection with the Transaction (as further defined below, the "Consideration"). For each Target or Development Firm listed on Exhibit A, the "Fee Period" is the period from the date the Target or Development Firm is listed on Exhibit A to the later of (i) two years after the Company first advises Daedalus pursuant to Section III(E) that it is no longer actively considering a Transaction involving such Target or Development Firm or (ii) if, before the end of the two year period described in clause (i), Company has engaged in a Transaction involving the Target or

Development Firm, four years from the date of such Transaction. Whether or not a Transaction is consummated, the Company will also reimburse Daedalus for any travel or other expenses reasonably incurred by Daedalus in connection with his services hereunder that have been approved in advance by the Company. Daedalus will not incur any expenses without approval from the Company. Notwithstanding anything in this Agreement that may be deemed to the contrary, if a Development Firm enters into a transaction regarding a Target with a third party not listed on Exhibit A that is unrelated to Company (a "Third Party"), and Company at any time enters into a transaction with such Third Party, then such transaction between Company and the Third Party shall not be a "Transaction" for purposes of this Agreement, and the Company shall have no obligation to pay Daedalus any amount in respect of Company's Transaction with any Third-Party.

Consideration shall include the total amount paid by the Company to the Development Firm or its shareholders or others, whether such payments take the form of cash, and/or common stock, preferred stock or debt issued by the Company. In the event that the aggregate consideration for a Transaction by the Company consists in whole or in part of stock, for the purposes of calculating the amount of aggregate consideration, the value of such securities will be (in the case of the existence of a public trading market therefor) the average bid or closing prices for the twenty business days preceding the issuance of the stock in the transaction, or (in the absence of a public trading market thereof) the fair market value thereof as the Company and Daedalus agree on the day preceding the issuance of the stock in the Transaction. If the value of the stock needs to be determined, pursuant to the next paragraph, on more than one occasion in connection with the Transaction, the value of the stock will be determined in such manner with respect to the days on which stock is issued.

Subject to the terms of this Agreement, at closing, Daedalus will be paid fees based on the total calculated Consideration, even if the total amount of Consideration is not paid at closing. For example, if Company agrees to pay a portion of the Consideration (for example, in the form of a note) over an agreed upon period (such as 3-5 years), Daedalus will be paid this total calculable consideration at closing based on the stated terms of such Consideration (but not including interest payable in the future), without regard to whether payments are ultimately made. The only exception will be if a portion of the Consideration is incalculable at closing (such as an earn-out, royalties, payments contingent on future sales, milestone payments, or other incentives based on future performance, etc.). In that case, that portion, and only that portion, of Daedalus' fees relating to such incalculable Consideration shall be paid to Daedalus if and when that portion of the Consideration is payable.

<u>See</u> Exhibit 1, Section II ("Compensation for Services").

35.    In exchange for this Consideration, the Original Agreement also provides for the following with respect to Mr. O'Brien's duties under the Original Agreement:

> Daedalus shall keep confidential and shall not disclose to any third person, all information (a) that is disclosed by the Company to Daedalus that is not in the public domain, (b) relating to this Agreement, including the fact that the Company has entered into this Agreement with Daedalus; and (c) that is later developed by Daedalus regarding Target in connections with the Company's evaluation and/or pursuit of the Transaction (collectively, "Information").   Daedalus shall use the Information only to assist the Company in evaluating and consummating the Transaction.   Daedalus' obligations in clauses (a), (b), and (c) shall survive the termination of this Agreement.
> …
> For four weeks after the date the Target or Development Firm on Exhibit A is first disclosed to the Company, Daedalus shall not disclose to any third party any information relating to the Transaction or the Target, and shall not assist any third person in any evaluation, consideration or negotiation of a Transaction (or any other transaction) involving the Target or Development Firm.  This restriction shall continue after such four-week period if prior to the end thereof, the Company has authorized Daedalus pursuant to Section 1(c) hereof to contact the Development Firm and thereafter until Company notifies Daedalus in writing that Company is not pursuing such Target or Development Firm.   In the event that Company ceases the active pursuit of the Target or Development Firm, it shall promptly notify Daedalus in writing.

<u>See</u> Exhibit 1, Section III ("Daedalus Representations and Covenants"), ¶¶ A & E.

36.    Among the entities identified on Exhibit A to the Original Agreement was Dyax.

<u>See</u> Exhibit A to Exhibit 1 hereto.

### Mr. O'Brien's Identification, Analysis, and
### <u>Extensive Communications with ViroPharma Regarding Dyax</u>

37.    As early as 2006, Mr. O'Brien had provided ViroPharma with written reports regarding Dyax.

205144759.3

38.   On June 21, 2006 at a dinner meeting at George's restaurant in Wayne, Pennsylvania, Mr. O'Brien provided Michel de Rosen, the CEO of ViroPharma, with an initial report on Dyax, which contained detailed information about Dyax, including:  corporate and financial information, descriptions of Dyax's assets, highlights of Dyax's products and patents, outlines of potential corporate partnerships, statistics relating to corporate valuations, and analysis of a potential strategic opportunity for ViroPharma in hereditary angioedema (HAE), an orphan disease presenting significant unmet medical need.  A true and correct copy of the initial report provided by Mr. O'Brien to ViroPharma on June 21, 2006 (the "Initial Report") is attached hereto and incorporated herein as "Exhibit 3."

39.   Following the delivery of the Initial Report, Mr. O'Brien had numerous meetings and telephone conversations with Mr. de Rosen, as well as with ViroPharma executives Vincent Milano (Chief Financial Officer for ViroPharma) and Clayton Fletcher (Vice President of Business Development for ViroPharma) concerning Dyax.

40.   After the execution of the Original Agreement, Mr. O'Brien continued to introduce ViroPharma to more potential acquisition candidates and provided substantial and valuable information to ViroPharma through numerous meetings, phone calls, and emails over the course of many years, without compensation.

41.   Although delivered prior to execution of the Original Agreement, the Initial Report was prepared at ViroPharma's request and after ViroPharma told Mr. O'Brien that he would be compensated for making an introduction that led to an acquisition and satisfied Mr. O'Brien's obligation under the Original Agreement to deliver a report regarding Dyax.

42.   Following execution of the Original Agreement, Mr. O'Brien provided ViroPharma with numerous communications relating to Dyax and its therapeutic area,

205144759.3

development/regulatory status, sales and marketing efforts, market position and why Mr.

O'Brien believed Dyax would be a good candidate for an acquisition.

43.     ViroPharma acquired several companies similar to those identified and analyzed by

Mr. O'Brien.

44.     For example, while Mr. O'Brien was recommending an acquisition of Dyax, whose

leading drug candidate addressed HAE and would have established ViroPharma's market

standing and expertise in the treatment of HAE, ViroPharma acquired Lev Pharmaceuticals in

2008.

45.     Lev Pharmaceuticals' most prominent product was the HAE drug Cinryze, which

has become very popular and extremely successful for ViroPharma and, eventually, defendants.

46.     Prior to Mr. O'Brien's recommendation of Dyax and its HAE drug, ViroPharma

was not considering drugs to treat HAE.  Upon information and belief,  Viropharma would not

have acquired Lev Pharmaceuticals absent the introduction to HAE and the analysis of the

commercial opportunity in treating HAE that was provided by Mr. O'Brien more than a year

before the Lev acquisition.

47.     In 2007, at the direction and request of Mr. de Rosen, Mr. O'Brien contacted senior

management at Dyax to discuss the possibility of ViroPharma acquiring either a Dyax process

known as DX-88 or the entirety of Dyax.

48.     In December 2007, Mr. O'Brien spoke with Mr. de Rosen and advised him of Mr.

O'Brien's analysis that Dyax was an extraordinary opportunity at its then market capitalization

of $180 million, which included $60 million in cash.

49.     On February 27, 2009, Mr. O'Brien had lunch with Mr. de Rosen's successor as

CEO of ViroPharma, Vincent Milano.

50. At that lunch meeting, Mr. O'Brien discussed the progress that Dyax was making and its attractiveness as an acquisition target. ViroPharma had just entered the HAE market with its introduction of the drug Cinryze. Mr. O'Brien suggested that Viropharma's acquisition of Dyax and its complementary drug, Kalbitor, then nearing approval for treatment of acute HAE, would allow Dyax to dominate the entire U.S. market. And once again, Mr. O'Brien emphasized the value of Dyax's Phage Display technology and the related partnerships.

51. In July 2009, Mr. O'Brien made a presentation to Mr. Fletcher and Mr. Milano discussing the virtues of acquiring Dyax. This included Mr. O'Brien's analysis that an acquisition of Dyax was particularly attractive at that time because Dyax's very low stock price did not accurately reflect its progress as a company, and Dyax could be acquired far below its true value.

52. Over the next several years, Mr. O'Brien provided regular telephone and email updates about Dyax to Mr. Fletcher and/or Mr. Milano.

**The Finder's Fee Agreement and Mr. O'Brien's Continued
Identification, Analysis, and Extensive Communications with
<u>ViroPharma Regarding Dyax</u>**

53. By 2012, Mr. O'Brien was performing a substantial amount of work for ViroPharma, but had not yet received any compensation.

54. By 2012 Dyax's DX-2930 HAE drug candidate was completing pre-clinical studies and was about to enter Phase 1 clinical trials.

55. From 2012 on, Mr. O'Brien had numerous conversations and email communications with Mr. Fletcher, the Vice President of Business Development for ViroPharma, continuing the flow of information from Mr. O'Brien to ViroPharma regarding the

12

benefits of acquiring Dyax, including repeated discussions on the status and opportunities presented by DX-2930.

56.   On November 29, 2012, Mr. O'Brien and ViroPharma, executed the Finder's Fee Agreement.

57.   The Finder's Fee Agreement was executed on behalf of ViroPharma by an authorized representative of ViroPharma, and represents a valid contract between ViroPharma and Mr. O'Brien.  See Exhibit 2.

58.   The Finder's Fee Agreement provided for substantially similar terms as those in the Original Agreement, but also provided for an advance against the finder's fee owed by Viropharma on the first Exhibit A company acquired.  This advance of $12,500 was paid, upon execution of the Finder's Fee Agreement, by ViroPharma to Mr. O'Brien.  See Exhibit 2, Section II ("Compensation for Services").

59.   Other than the addition of the $12,500 advance, the services Mr. O'Brien was to provide, the restrictions upon Mr. O'Brien, and the compensation/consideration ViroPharma would pay Mr. O'Brien by ViroPharma were the same in the Finder's Fee Agreement as in the Original Agreement.

60.   The Finder's Fee Agreement included a "corrected" and updated version of Exhibit A to the Original Agreement, which continued to identify Dyax.

61.   Exhibit A to the Finder's Fee Agreement was updated and amended periodically, and the most recent revision to Exhibit A to the Finder's Fee Agreement continued to identify Dyax.  A true and correct copy of the most recent Exhibit A to the Finder's Fee Agreement is attached hereto as "Exhibit 2A."

62.   On November 29, 2012, ViroPharma and Mr. O'Brien also entered into a Consulting Agreement, a true and correct copy of which is attached hereto and incorporated herein as "Exhibit 4."

63.   The Consulting Agreement provided that "[i]n addition to the services to be provided under the Finder's Fee Agreement, Consultant [Mr. O'Brien] shall provide the following "Services" as directed by ViroPharma:  preparation of reports and research related to Business Development Opportunities."  See Exhibit 4, Section 1(a) ("Services").

64.   As compensation, the Consulting Agreement provided that "ViroPharma shall pay Consultant $300 per hour.  ViroPharma shall not be obligated to pay Consultant more than $50,000 for the Services without the prior consent of ViroPharma."  See Exhibit 4, Section 2 ("Compensation & Expenses").

65.   ViroPharma subsequently amended the Consulting Agreement on three occasions to modify hourly and maximum compensation for Mr. O'Brien, and to extend the duration of that contract.

66.   In 2013, Mr. O'Brien sent many emails and participated in multiple telephone calls with Mr. Fletcher to update him on positive developments at Dyax, including, *inter alia*:  1) promising preclinical studies suggesting that Dyax's second generation HAE drug DX-2930 offered the potential for once-monthly administration;  2) the potential use of Dyax's kallikrein inhibitors to treat the rare diseases known as Netherton Syndrome and Diabetic Macular Edema;  3) the potential of Dyax's Phage Display technology platform to provide a regular stream of attractive drug candidates to Dyax and its licensees;  4) a future revenue stream from more than a dozen drug candidates in Dyax's Licensing and Funded Research Portfolio ("LFRP") in clinical development at some of the world's leading pharmaceutical companies – including

14

Ramucirumab (Cyramza), a compound with blockbuster potential now marketed by Lilly to treat gastric, lung, and colorectal cancer and in clinical development for multiple other tumor types ; and 5) the possibility of expanding the share of Dyax's drug Kalbitor of the acute HAE market. All of these drugs, both in sole development by Dyax and partnered, are products of Dyax's own first-rate Phage Display technology.

67.    On July 11, 2013 Mr. O'Brien stated to Mr. Fletcher, "I feel as strongly about a Dyax acquisition today, if not more so, than ever."

68.    On September 25, 2013, Mr. O'Brien made a strategic presentation for more than two hours to Mr. Milano and Mr. Fletcher at ViroPharma's office.

69.    In addition to a discussion of Mr. O'Brien's work involving lysosomal storage disorders, more than an hour of the September 25, 2013 meeting was devoted to:  1) Mr. O'Brien's  discussion of a strategy for creating a first-rate pharmaceutical product pipeline and how ViroPharma could successfully compete with larger firms for desirable assets;  2) protection of ViroPharma's HAE market position in light of Dyax's DX-2930 potential for once monthly administration, and in light of Biocryst's oral kallikrein development program;  3) an update on Dyax's Phage Display partnerships with an emphasis on Ramucirumab and other potential blockbusters producing an ever-increasing revenue stream for Dyax;  4) a discussion of the potential acquisition of either Dyax or Biocryst in detail;  and 5) other immediate acquisition opportunities in orphan indications outside HAE.

70.    The September 25, 2013 meeting was another instance where Mr. O'Brien made a presentation to ViroPharma about the opportunities available in the HAE market, which continued through Shire's acquisition of ViroPharma and later acquisition of Dyax.

71.    During this meeting, Mr. Milano and Mr. Fletcher listened closely and much of the information that Mr. O'Brien conveyed was ultimately used by ViroPharma in pursuing its acquisition by Shire.

72.    Notably, during this meeting, Mr. O'Brien actually suggested that ViroPharma model itself on Shire when it came to drug development by making a significant early stage investment into promising programs, both commercial and academic, to maximize the productivity of the firm's business development effort.

73.    In October 2013, Mr. O'Brien spoke with Mr. Fletcher and again emphasized the multiple advantages to Viropharma of an acquisition of Dyax.

74.    Mr. O'Brien continued to provide ViroPharma with a significant amount of important and material information on the orphan drug market, including the building competitive threat in the HAE market,  which helped ViroPharma in negotiating the sale of ViroPharma to Shire.

**The Shire ViroPharma Merger and
Shire's Assumption of the Finder's Fee Agreement**

75.    On or about November 11, 2013, defendant Shire Pharmaceutical Holdings Ireland Limited, Venus Newco, Inc., ViroPharma and defendant Shire plc, Venus Newco, Inc. (a merger subsidiary of defendant Shire Pharmaceutical Holdings Ireland Limited, which was itself a subsidiary of defendant Shire plc), entered into an Agreement and Plan of Merger pursuant to which Venus Newco, Inc. merged into ViroPharma (the "Shire ViroPharma Merger") so that ViroPharma became part of defendant Shire.  A true and correct copy of the relevant portion of the Agreement and Plan of Merger ("Shire ViroPharma Merger Agreement"), which is publicly-filed, is attached hereto and incorporated herein as "Exhibit 5."

76.     By and through the Shire ViroPharma Merger, defendants Shire plc and Shire Pharmaceutical Holdings Ireland Limited purposefully directed their activities toward the Commonwealth of Pennsylvania by taking part in the acquisition of a corporation with a principal place of business in this jurisdiction.

77.     Prior to the Shire-ViroPharma Merger, Mr. Milano informed defendant Shire that: (1) ViroPharma had a contractual relationship with Mr. O'Brien;  and (2) if defendant Shire were to acquire ViroPharma, defendant Shire would be obligated to Mr. O'Brien in the event that defendant Shire acquired any of the companies identified on Exhibit A to the Finder's Fee Agreement.  Defendant Shire told Mr. Milano that they understood and accepted that obligation.

78.     Following the Shire ViroPharma Merger, Venus Newco, Inc. ceased to exist.  See Exhibit 5, Article II, Section 2.1.

79.     Following the Shire ViroPharma Merger, ViroPharma changed its name to defendant Shire ViroPharma Incorporated.

80.     In 2013, in anticipation of the Shire ViroPharma Merger, David Colpman, Head of Worldwide Business Development of defendant Shire, acknowledged to both Mr. Milano and Mr. Fletcher that defendant Shire would recognize the Finders Fee Agreement.

81.      At the time of this acknowledgement, Messrs. Colpman, Milano and Fletcher discussed protecting defendant Shire's market position in HAE treatment, which Mr. O'Brien had helped to cultivate.

82.     When Mr. O'Brien later met in Exton, PA with Mr. Colpman, Mr. Fletcher and Deanna Petersen, Vice President Business Development for defendant Shire, Mr. Colpman again acknowledged the existence of the Finder's Fee Agreement and admitted defendant Shire's obligations to Mr. O'Brien under the Finder's Fee Agreement.

83.    In these meetings and through the communications between Shire officials and Mr. O'Brien, defendant Shire adopted the Finder's Fee Agreement previously executed between ViroPharma and Mr. O'Brien.

84.    On November 7, 2013, four days prior to the date of the Shire Viropharma Merger Agreement referenced below, Shire issued a press release stating that it "has been implementing the 'One Shire' reorganisation aimed at simplifying the business.  Prior to this, Shire had three autonomous divisions, each with their own R&D, supply chain, technical operations and commercial infrastructures.  These three divisions are being reorganised so they are one business, with much reduced overlap." (emphasis added)  See "Exhibit 6."

85.    Shire comprises a single operational and reporting segment engaged in the research, development, licensing, manufacturing, marketing, distribution, and sale of innovative specialist medicines to meet significant unmet patient needs.  See "Exhibit 6."

86.    As noted in Shire's 2016 Form 10-K, the relevant portion of which is attached hereto as "Exhibit 7," the "One Shire model has created a simple structure and a focused, efficient organization that is scalable for growth.  The core elements of this model have been retained through multiple acquisitions since its original implementation."  See Exhibit "7" (emphasis added).

87.    Since Viropharma was acquired by Shire, the business and operations of Viropharma have been integrated into Shire.

88.    The contacts between Shire and Mr. O'Brien, the overlap of personnel among various Shire entities, the public and private statements made by Shire, and the integration of Viropharma into Shire also created for Mr. O'Brien a reasonable belief that, notwithstanding any alleged corporate distinctions between the various Shire entities, defendants acted not only as

18

agents for each other with respect to the Finder's Fee Agreement, but as a single corporate entity known as "Shire."

89.    During Mr. O'Brien's meetings with Shire officials in Exton, PA  Mr. O'Brien specifically advocated Dyax as a compelling, top-tier acquisition candidate in light of (1) Shire's recently enhanced  position in HAE and the need to protect its market position in both acute and prophylactic indications from growing competition;  (2) early clinical work suggesting that Dyax's second generation HAE compound DX-2930 could offer the convenience of once-monthly dosing;  (3) the capability of Dyax's Phage Display technology to generate additional drug candidates for both its own pipeline and for partnering with other firms;  (4) the growing revenue potential of compounds in Dyax's LFRP (Licensing and Funded Research Portfolio); and (5) adding Dyax's drug Kalbitor to Shire's drug Firazyr would immediately give Shire virtually the entire acute HAE market..

90.    Under Mr. O'Brien's consulting agreement with ViroPharma, Mr. O'Brien prepared an extensive report on lysosomal storage disorders.

91.    At the meeting in Exton, PA, Mr. Colpman, who was aware of that report, questioned Mr. O'Brien specifically about that field, which was at that time was, and which remains, a very important disease group to Shire.

92.    At the meeting, Mr. Colpman questioned Mr. O'Brien about which companies among those listed on Exhibit A to the Finder's Fee Agreement would be the most attractive acquisition candidates, and also asked Mr. O'Brien which companies he would add to that Exhibit A, if Mr. O'Brien could.

93.    Prior to the meeting, Mr. Fletcher had requested that Mr. O'Brien not discuss with Mr. Colpman additional potential acquisition candidates not yet on Exhibit A until the Viropharma acquisition was complete.  Mr. O'Brien agreed and did not do so.

94.    In short, because of the constant stream of information that Mr. O'Brien provided to ViroPharma, defendant Shire reaped the benefit of Mr. O'Brien's extensive advice to ViroPharma.

95.    In addition, because of the information that Mr. O'Brien provided directly to Shire, defendant Shire reaped the benefit of Mr. O'Brien's extensive advice.

96.    Because the Finder's Fee Agreement remained in force, Mr. Colpman specifically requested that Mr. O'Brien refrain from suggesting any additional companies that would be added to Exhibit A to the Finder's Fee Agreement.

97.    At no time did defendant Shire notify Mr. O'Brien in writing, as required by the Finder's Fee Agreement, that defendant Shire had ceased pursuing Dyax.  Therefore, Mr. O'Brien's contract with defendant Shire prohibited him from disclosing to any third party any information relating to Dyax or assisting any third person in any evaluation, consideration or negotiation of a transaction involving Dyax, which constituted a valuable benefit to defendant Shire.  Because of the subsequent refusal by defendants to compensate Mr. O'Brien, this was to his personal detriment.

98.    In reliance upon defendant Shire continuing to honor its contracts with him, Mr. O'Brien refrained from disclosing to any third party any information relating to Dyax or assisting any third person in any evaluation, consideration or negotiation of a transaction involving Dyax, which constituted a valuable benefit to defendant Shire.  Because of the subsequent refusal by defendants to compensate Mr. O'Brien, this was to his personal detriment.

205144759.3

99.   In several emails between Mr. O'Brien and Mr. Colpman and/or Ms. Petersen in early- to mid-2014, Ms. Petersen expressed her thanks to Mr. O'Brien for his updates on recommendations listed on Exhibit A, provided a framework for the transmission of further updates on Exhibit A listings, and promised to pass Mr. O'Brien's advice along to defendant Shire's "scouts for review."  <u>See</u> email correspondence between Mr. O'Brien and Mr. Colpman and Ms. Petersen, attached hereto as "Exhibit 8."

100.  These communications were clear confirmation that Shire had assumed the Finder's Fee Agreement and continued to benefit from the service Mr. O'Brien continued to render in accordance with that contract.

101.  On March 31, 2015, Mr. O'Brien emailed Ms. Petersen about an unrelated matter. However, he specifically referenced "the terms of our finder's fee contract Shire assumed when you bought Viropharma." A true and correct copy of the March 31, 2015 email correspondence is attached hereto and incorporated herein as "Exhibit 9."  At no time did Ms. Petersen deny that the Finder's Fee contract remained in effect or was binding on Shire.

102.  On July 7, 2015, Mr. O'Brien wrote to Blaine McKee, Senior Vice President and Head of Transactions at Shire, and stated:  "allow me to bring to your attention Daedalus' most recent update on our recommendation of Dyax.  Dyax appears on the Exhibit A list that Shire assumed with your purchase of Viropharma." A true and correct copy of the July 2015 correspondence is attached hereto and incorporated herein as "Exhibit 10."

103.  Furthermore, in his the July 7, 2015 email, Mr. O'Brien stated that he, "continue[d] to believe that Dyax's DX-2930 drug is existentially important to preserving your [defendants'] HAE franchise, a disorder that I first brought to the attention of Michel de Rosen when he was CEO of Viropharma.  Today there was more good news from the FDA granting DX-2930

'breakthrough' designation.  Besides HAE prophylaxis there is immediate presence in the acute

sector with Dyax's Kalbitor—as well as the large footprint of Licensing and Funded Research

Program (LFRP)."  See "Exhibit 10."

104.  The July 7, 2015 email correspondence incorporated an earlier email that Mr.

O'Brien sent to Ms. Petersen on July 1, 2015, which stated:

> I wanted to call your attention once again to the presence of Dyax on the
> Exhibit A list of Daedalus recommendations Shire inherited when it took
> over Viropharma, and its crucial importance in retaining your Hereditary
> Angioedema (HAE) franchise.  Acquiring Dyax would immediately give
> you possession of Kalbitor, an acute treatment expanding your dominant
> HAE position.
>
> More importantly, you would also gain possession of DX-2930, the
> leading drug candidate in clinical development for Hereditary
> Angioedema.  We believe this acquisition will not only eliminate an
> existential threat posed by Dyax to your HAE franchise, but DX-2930 is
> superior to the most advanced compound produced by Biocryst's oral
> HAE program.  We do not believe Shire can afford to remain passive
> continuing to rely on first generation Cinryze as more effective treatments
> threaten your HAE position.
>
> The third important Dyax asset is the stream of royalty income from their
> Licensing and Funded Research Program (LFRP).  This program has the
> possibility of significantly expanding its payments to Dyax in the coming
> years as its corporate collaborators move their compounds through clinical
> trials to approval.

<u>See</u> "Exhibit 10."

105.  At no time did defendant Shire ever advise Mr. O'Brien that it was not bound by the

Finder's Fee Agreement or that the Finder's Fee Agreement was no longer in force.

106.  When the Dyax Merger (as defined below) was ultimately announced on November

2, 2015, Shire highlighted the same advantages, using the same concepts, that Mr. O'Brien had

highlighted months earlier.  Specifically, defendant Shire stressed:

**Transaction Highlights**
**<u>DX-2930</u>**

22

- Adds Dyax's DX-2930, a Phase 3-ready, long-acting injectable monoclonal antibody for HAE prophylaxis, with the potential to lower rates of HAE attacks and significantly improve patient convenience based on clinical trial data reported to date
- Offers patent protection and anticipated regulatory exclusivity beyond 2030
- Adds to Shire's best-in-class therapies addressing significant unmet patient need

**Shire and Dyax Combination**
- Combines Dyax's HAE commercial and research and development expertise with Shire's HAE leadership and proven ability to advance rare disease assets through development to commercialization
- Provides additional early-stage antibody pipeline programs for the treatment of autoimmune diseases, diabetic macular edema and thrombosis
- Adds Dyax's well-established proprietary phage display antibody generation technology to Shire's rare diseases discovery capabilities, as well as partnering revenue associated with Dyax's Licensing and Funded Research Portfolio (LFRP)

**Shire**
- Expands and extends Shire's industry-leading HAE portfolio (FIRAZYR and CINRYZE), advancing its leadership position in rare diseases and enhancing an already robust growth profile
- Brings potential for substantial value creation to Shire's shareholders, with significant earnings accretion expected assuming FDA approval and anticipated DX-2930 launch in 2018
- Furthers Shire's transformation to a leading global biotech and world leader in rare diseases.

See Shire Press Release, November 2, 2015, attached hereto as "Exhibit 11."

107.  According to the proxy statement later filed by Dyax in connection with the Dyax Merger (as defined below), Shire first contacted Dyax concerning a possible acquisition on September 10, 2015 just weeks after Mr. O'Brien contacted Mr. McKee and Ms. Petersen and again reiterated his recommendation that Shire should acquire Dyax.  A true and correct copy of the relevant portion of that proxy statement is attached hereto and incorporated herein as "Exhibit 12."

23

**The Dyax Merger and Shire's Obligations Under the Finder's Fee Agreement**

108.  On or about November 2, 2015, defendant Shire plc, defendant Shire

Pharmaceuticals International, Parquet Courts, Inc. and Dyax, entered into an Agreement and

Plan of Merger.  Pursuant thereto,  Parquet Courts, Inc., a subsidiary created to facilitate the

merger and owned by defendant Shire Pharmaceuticals International, merged into Dyax, with

Dyax continuing as the surviving corporation and as a wholly-owned subsidiary of defendant

Shire Pharmaceuticals International.  A true and correct copy of the Securities and Exchange

Commission Form 8-K relating to the foregoing merger (the "Dyax Merger") is attached hereto

and incorporated herein as "Exhibit 13."

109.  At the time of the Dyax Merger, Shire Viropharma was no longer a functioning

independent business.

110.  The Dyax merger became effective on January 22, 2016.  See Exhibit 13, Item 2.01

("Completion of Acquisition or Disposition of Assets").

111.  As consideration for the Dyax Merger, Shire has thus far paid approximately $5.9

billion.  See Exhibit 13, Item 2.01.

112.  In the event that the United States Food and Drug Administration ("FDA")

approves the DX-2930 drug for use in treating HAE Type 1 or Type 2, on or before December

31, 2019, Shire will be required to pay an additional $646 million in additional consideration for

Dyax.  See Exhibit 10.1 to Exhibit 13.

113.  The FDA's decision to approve DX-2930 for use in treating HAE Type 1 or Type 2,

on or before December 31, 2019 is a binary condition and, in the event that such approval occurs,

Shire's obligation to pay the additional $646 million consideration is concrete, fixed and

determined.

114.  Following the Dyax Merger, Dyax became a wholly-owned subsidiary of defendant Shire Pharmaceuticals International, which is a wholly-owned subsidiary of defendant Shire plc. See Exhibit 13, Item 2.01.

115.  In connection with defendant Shire's announcement of the Dyax acquisition, defendant Shire emphasized that the key reason for the acquisition was Dyax's DX-2930 drug, which targets HAE.

116.  Defendant Shire's press release on November 2, 2015 refers to defendant "Shire's HAE leadership" and defendant "Shire's industry-leading HAE portfolio (FIRAZYR and CINRYZE)."  A true and correct copy of the November 2, 2015 press release is attached hereto and incorporated herein as "Exhibit 11."

117.  Dr. Flemming Ornskov, M.D., defendant Shire's Chief Executive Officer, further stated that:

> DX-2930 is a strategic fit within out HAE domain expertise, and we are well-position[ed] to advance the development, registration, and commercialization of DX-2930 for the benefit of HAE patients.  This transaction also offers other potential upside opportunities, including Dyax's early-stage pipeline.  Following the close of this transaction, we look forward to welcoming Dyax employees, who will bring to Shire substantial clinical and commercial expertise on HAE.  Dyax is to be commended for the world class organization they have built focused on HAE. I am also confident that our M & A expertise is the ongoing strength of our business will enable rapid and effective integration following the closing, as demonstrated by the success of our NPS and Viropharma acquisitions."  See Exhibit 11.

118.  Another Shire press release has referred to Cinryze as "one of Shire's top selling products."  True and correct copies of such press releases are attached hereto as "Exhibit 14."

119.  These press releases are similar to the press release issued on November 11, 2013, when defendant Shire announced the acquisition of Viropharma, which made it clear that

Viropharma's ability to treat HAE with Cinryze was a key inducement for the deal.  See Exhibit 15.

120.  As these press releases emphasize, one of the principal motivations for the Dyax merger was to secure Shire's leadership in the HAE market – a leadership role that Shire enjoys by virtue of defendant Shire ViroPharma's ownership and/or distribution of Cinryze.

121.  The substantial cash flow generated by Cinryze was an important factor in the ability of Shire to obtain the financing to acquire Dyax.

122.  Mr. O'Brien had promoted Dyax to ViroPharma and then to defendant Shire on the basis that Dyax's DX-2930 drug candidate would protect defendants' significant presence in the HAE market, would enable defendants to generate substantial profits because DX-2930 treated an orphan disease, and would allow defendants to profit from Dyax's Phage Display technology and the partnerships built on that technology with some of the world's leading pharmaceutical and biotechnology firms.

123.  Thus, defendant Shire acquired Dyax for the same reasons that Mr. O'Brien had promoted Dyax to both ViroPharma and defendant Shire: 1) the potential to further enhance defendant Shire ViroPharma's (and eventually defendant Shire's) leadership in HAE pharmaceuticals; and 2) to capitalize on Dyax's cutting edge Phage Display technology, and the drug candidates and partnership revenues it would bring to Dyax.

124.  The business development operations of defendant Shire and its defendant subsidiaries are so intertwined that there can be no distinction between them.

125.  Defendant Shire, directly and through its defendant subsidiaries, is now acting as a single entity for purposes of the claims asserted in this action.

126.     Even the clinical trials leading to the approval of Cinryze for various applications, all of which ViroPharma or its predecessors performed, are now listed on clinicaltrials.gov as having been completed by defendant Shire.  True and correct copies of information from the federal clinical trials website are attached hereto and incorporated herein as "Exhibit 16."

127.   At all times following the Shire ViroPharma Merger, Mr. O'Brien reasonably believed and relied upon the fact that Shire and its defendant subsidiaries were acting as a single entity.

128.   Mr. O'Brien introduced Dyax to defendant Shire and provided detailed and significant reasons to acquire Dyax.

129.   Thanks to the information and analysis provided by Mr. O'Brien to ViroPharma and, later to defendant Shire:

   a.   ViroPharma learned about the opportunities in the HAE market, which ViroPharma later employed in acquiring Lev Pharmaceuticals, which marked ViroPharma's entry into the HAE pharmaceutical market;

   b.   Defendant Shire acquired ViroPharma, marking defendant Shire's expansion of its presence in the HAE pharmaceutical market;  and

   c.   Defendant Shire acquired Dyax, solidifying defendant Shire's position as a leader in the HAE pharmaceutical market and allowing it to capitalize on, *inter alia*:  (i)  the enhanced pricing benefits available to orphan drugs; (ii) Dyax's Phage Display technology;  (iii) Dyax's expertise in kallikrein inhibition that together with Phage Display led to the development of the second generation fully human Mab DX-2930 for HAE, as well as therapies for multiple additional orphan indications amenable to treatment with this class of therapy, such as Netherton Syndrome and Diabetic Macular Edema;  and (iv) Dyax's participation in LFRP partnerships.

130.   To the extent that defendant Shire already possessed information relating to Dyax, Mr. O'Brien brought his experience to bear and provided confirmation from a sophisticated analyzer of the biopharma market that an acquisition of Dyax would be advantageous.

27

131.  On December 21, 2015, counsel for Mr. O'Brien sent correspondence to Chris Allen, Esquire, the head of U.S. Litigation and Investigations for defendant Shire, outlining the facts and circumstances surrounding the Finder's Fee Agreement and the obligations thereunder triggered by defendant Shire's purchase of Dyax.  A true and correct copy of the December 21, 2015 correspondence is attached hereto and incorporated herein as "Exhibit 17."

132.  On January 26, 2016, after the closing of the Dyax Merger, Mr. O'Brien sent correspondence to Mr. Blaine McKee, enclosing an invoice for $58,987,500, which represents the balance due to Mr. O'Brien under the Finder's Fee Agreement.  A true and correct copy of the January 26, 2015 correspondence and invoice is attached hereto and incorporated herein as "Exhibit 18."

133.  To date, the amount due to Mr. O'Brien under that invoice have not been paid.

134.  The invoice also noted that Shire may still owe Mr. O'Brien an additional $6,460,000 in connection with certain Contingent Value Rights associated with the Dyax Merger.  See Exhibit 18.

135.  ViroPharma and, after the Shire/ViroPharma Merger, defendant Shire, have reaped substantial benefit from Mr. O'Brien's efforts under the Finder's Fee Agreement, and there is no basis for defendants to refuse to honor their commitments under the Finder's Fee Agreement.

136.  By expanding through acquisitions like the Shire ViroPharma Merger and the Dyax Merger, and by leveraging all of the resources of its various subsidiaries and corporate affiliates under a single umbrella, Shire has maintained a systematic and continuous business operation throughout the United States, placing its products into the stream of commerce with the intention, and the effect, of reaching consumers throughout the country.

137.  Through its acquisition of ViroPharma, Shire has a continuous and systematic corporate presence in the Commonwealth of Pennsylvania, and Shire (including those Shire subsidiaries named as defendants in this action) have not only enabled that continuous presence in Pennsylvania, but have expanded Shire's pharmaceutical business operations in this jurisdiction by marketing an expanded group of drugs to residents of Pennsylvania.

### Count I:  Breach of Contract

138.  Mr. O'Brien incorporates by reference the allegations in the preceding paragraphs as though fully set forth at length herein.

139.  The Finder's Fee Agreement constitutes a valid contract between Mr. O'Brien and ViroPharma, which defendant Shire assumed upon or following the consummation of the Shire/ ViroPharma Merger.

140.  The contract between the parties required defendant Shire to pay to Mr. O'Brien one percent of the total consideration for any transaction involving defendant Shire and any entity listed on Exhibit A to the Finder's Fee Agreement, provided that Mr. O'Brien carried out his obligations under the Finder's Fee Agreement.

141.  Mr. O'Brien satisfied all of the obligations imposed upon him by the Finder's Fee Agreement.

142.  Among the entities listed in Exhibit A of the Finder's Fee Agreement was Dyax.

143.  Defendant Shire's consummation of the Dyax Merger constituted a Transaction for purposes of the Finder's Fee Agreement, whereby defendant Shire acquired an entity identified under Exhibit A of the Finder's Fee Agreement, for which Mr. O'Brien provided all required services, and for which defendant Shire was obligated to compensate Mr. O'Brien pursuant to the Finder's Fee Agreement.

29

144.   At present, and despite repeated demands from Mr. O'Brien, defendant Shire has failed to make payment to Mr. O'Brien of the amount due and owing under the Finder's Fee Agreement.

145.   The failure of defendant Shire to make payment under the Finder's Fee Agreement constitutes a breach of the Finder's Fee Agreement.

146.   As a result of defendant Shire's breach of the Finder's Fee Agreement, Mr. O'Brien has sustained damages in the current amount of $58,987,500, plus pre-judgment interest.

WHEREFORE, plaintiff, Bruce G. O'Brien d/b/a Daedalus Biotech Advisors respectfully requests judgment in his favor and against defendants in the amount of $58,987,500, costs, plus pre- and post-judgment interest at the statutory interest rate, together with such other and further relief as this Court may deem proper.

## Count II:  Unjust Enrichment
### (In The Alternative)

147.   Mr. O'Brien incorporates by reference the allegations in the preceding paragraphs as though the same were fully set forth at length herein.

148.   In the alternative to the breach of contract claim set forth above, Mr. O'Brien seeks compensation from each of the defendants to the extent that it (or collectively, as the single Shire entity) has been unjustly enriched by Mr. O'Brien's deployment of his services exclusively on behalf of Shire.

149.   The Finder's Fee Agreement conferred a number of substantial and valuable benefits upon Shire, including but not limited to Mr. O'Brien's services in identifying, investigating, evaluating, analyzing, and providing information to Shire with respect to various acquisition targets.

150.  The benefits conferred upon Shire by the Finder's Fee Agreement also included restrictions upon Mr. O'Brien's ability to use his expertise and provide the same services to other entities that may have been interested in pursuing a transaction with Dyax and the other entities identified by Mr. O'Brien on Exhibit A of the Finder's Fee Agreement.

151.  Defendant Shire retained these benefits, and never rejected or terminated the Finder's Fee Agreement, pursuant to the termination provisions of the Finder's Fee Agreement or otherwise.

152.  Following the Shire/ViroPharma Merger, defendant Shire continued to retain and accept the numerous, valuable benefits conferred by Mr. O'Brien, without compensating him.

153.  In fact, defendant Shire continued to reaffirm the validity of the Finder's Fee Agreement.

154.  Defendant Shire has refused to satisfy its obligations under the Finder's Fee Agreement, without cause or privilege for such refusal.

155.  Defendant Shire's retention of the benefits conferred upon it by the Finder's Fee Agreement is unjust.

156.  It is unjust for defendants, on the one hand, to hold themselves out to the world as a single entity and to benefit from that representation, but for defendants also, on the other hand, to refuse to honor the agreements with Mr. O'Brien on the pretext that they are allegedly separate, distinct entities with no contractual or legal duty to him.

157.  Mr. O'Brien has sustained damages as a result of defendant Shire's unjust retention of the benefits provided under the Finder's Fee Agreement.

WHEREFORE, plaintiff, Bruce G. O'Brien d/b/a Daedalus Biotech Advisors respectfully requests judgment in his favor and against the defendants in the amount of $58,987,500, costs,

205144759.3

plus pre- and post-judgment interest at the statutory interest rate, together with such other and further relief as this Court may deem proper.

## **Count III:  Declaratory Judgment**

158.  Mr. O'Brien incorporates by reference the allegations in the preceding paragraphs as though fully set forth at length herein.

159.  Pursuant to the Finder's Fee Agreement, defendant Shire currently owes Mr. O'Brien $58,987,500, plus pre-judgment interest at the statutory rate of interest, on account of the closing of the Dyax Merger.

160.  The Dyax Merger included potential future payments by defendant Shire in connection with the Contingent Value Rights Agreement included as part of the Dyax Merger Agreement, in the amount of $646 million.

161.  Those payments are to be made in the event that the DX-2930 drug receives the approval of the U.S. Food and Drug Administration ("FDA") for prevention of HAE types 1 and 2 by December 31, 2019.

162.  In the event that such Contingent Value Rights ultimately vest, Mr. O'Brien is entitled to payment from defendant Shire in the amount of $6.46 million.

163.  Mr. O'Brien seeks a declaration that, should the FDA approve the DX-2930 drug for prevention of HAE types 1 and 2 on or before December 31, 2019, Mr. O'Brien is entitled to an additional payment of $6.46 million, pursuant to the Finder's Fee Agreement.

164.  Granting such a declaration serves the interests of judicial economy insofar as the determination of whether the Contingent Value Rights Agreement vests is determined on a binary condition—whether the DX-2930 drug receives the approval of the FDA for prevention of HAE types 1 and 2 by December 31, 2019.

205144759.3

165.  Because of this binary condition with respect to FDA approval by a date certain, Mr. O'Brien's rights to payment are currently fixed, concrete and determined by the Contingent Value Rights Agreement.

166.  The mere fact that the underlying FDA approval may or may not occur does not affect Mr. O'Brien's fixed, concrete and determined rights to payment upon such approval.

WHEREFORE, plaintiff, Bruce G. O'Brien d/b/a Daedalus Biotech Advisors respectfully requests declaratory judgment that should the FDA approve the DX-2930 drug for prevention of HAE types 1 and 2 on or before December 31, 2019, Mr. O'Brien is entitled to an additional payment of $6.46 million, pursuant to the Finder's Fee Agreement, together with such other and further relief as this Court may deem proper.

Respectfully submitted,

CLARK HILL PLC

Dated: November 18, 2016

/s/ Jonathan W. Hugg
Jonathan W. Hugg
Pa. Id. No. 73589
Samuel A. Hornak
Pa. Id. No. 312360
Jonathan D. Klein
Pa. Id. No. 309967
2005 Market Street, Suite 1000
Philadelphia PA, 19103
(215) 640-8500

*Attorneys for Plaintiff,*
*Bruce G. O'Brien d/b/a*
*Daedalus Biotech Advisors*

205144759.3

34